HENRY WARNER, ASSIGNEE, v. M. K. McMULLIN.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS NO. 2 OF ALLEGHENY COUNTY, IN EQUITY.

Argued November 11, 1889—Decided January 6, 1890.

(a) A bill in equity, filed by the assignee for creditors of an insolvent bank against the president of the bank and others, charged that the defendants had unlawfully withdrawn from the bank large sums of money, and had used and lost the same in illegal gambling transactions in oil.

(b) The prayers of the bill were for a decree that the matters and things

Master's Report.

charged in the bill were matters of account, and that the defendants should pay to the plaintiff all sums of money and the value of all property illegally and improperly withdrawn from the bank by the defendants:

1. Whether the jurisdiction of the court might be sustained on the ground that the president was a trustee of the corporation's funds, doubted; but the jurisdiction could be sustained on the ground that the remedy at law, involving the consideration by a jury of a mass of complicated accounts, would be inadequate.

2. The appeal in this case, being from the decree of the court below approving the report of the master, specifications of error averring that the *master* erred in finding and omitting to find certain facts, were insufficient and might well be dismissed for that reason alone.

Before PAXSON, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 236 October Term 1888, Sup. Ct.; court below, No. 166 July Term 1886, C. P. No. 2 in equity.

On April 26, 1886, Henry Warner, assignee of the Penn Bank, for the benefit of creditors, filed a bill in equity against M. K. McMullin, W. N. Riddle and John P. Beall. Answers of the respondents having been filed, the cause was referred to *Mr. W. B. Rodgers,* appointed examiner and master, whose report, filed on October 5, 1887, was in part as follows:

The plaintiff in his bill avers that the Penn Bank was a corporation engaged in the banking business until May 26, 1884, receiving and having large deposits; that on that day it became insolvent and closed its doors, and shortly afterwards made a voluntary assignment to the plaintiff, who accepted the trust; that W. N. Riddle, one of the defendants, was cashier of the bank until the year 1882, and from that date until the closing of the bank was its president and received a salary; that as president he had control of the officers and employees of the bank, and personally and through his subordinates largely superintended and controlled the business of the bank and had possession and control of its money and assets; that during 1883 and a portion of 1884 the defendants unlawfully and repeatedly withdrew, and at their instance had withdrawn from the bank, large sums of money aggregating $1,000,000 and other assets; that said money was withdrawn and used by the defendants, and at their instance, in illegal and unlawful

dealing in oil or certificates therefor ; that the transactions for which said money was withdrawn and used were gambling transactions ; that no portion of the money so withdrawn and used by defendants, or at their instance, could be lawfully withdrawn, or used for such purposes ; that it was Riddle's duty as president to see that no portion of the money of the bank was withdrawn except for the legitimate business of the bank, yet in disregard of his duty he allowed and procured said money to be withdrawn and used, and in doing so he was aided and assisted by the other defendants ; that the defendants in the withdrawal of said money acted in pursuance of a common purpose to procure and have procured said money illegally and for an illegal purpose ; that by reason of said acts of defendants the bank was financially ruined, and money and property, above all credits, to a value exceeding $1,000,000 abstracted from the bank ; that the accounts are complicated, intricate and involved, and no adequate remedy at law could be had in reference thereto ; that portions of the money and property so withdrawn, but how much is not known, have come into the hands of the defendants who refuse to account therefor, and that there is danger of defendants disposing of the same.

The bill asks for a decree, inter alia, that the matters and things referred to are matters of account ; that defendants shall pay all such sums of money and the value of all property illegally and improperly withdrawn by the defendants in 1883 and 1884, etc.

The defendants filed separate answers.    The answer of Mr. Riddle denies that he had control of the officers and employees of the bank, or its money or assets, but that the directors had such control, and that the assets of the bank were under the control of F. B. Laughlin, a member of the board and treasurer, and that he (Riddle) during 1883 and 1884 was absent for long periods by reason of illness.   He denies any improper or illegal withdrawal or use of the funds of the bank, or any combination with the other defendants in relation to any matter or thing connected with the bank.    He also denies that there were any transactions between himself and the bank involving mutual accounts, or that the accounts are complicated, intricate and involved, and avers that plaintiff has an adequate

remedy at law. He also denies the right of the plaintiff to maintain the bill, because at No. 26 October Term 1884, in this court, an action at law was brought against him, with others, for the same cause for which this bill is filed; that when said cause was called for trial the plaintiff, with consent of defendants, discontinued the suit and paid the costs. He also avers that as president he made frequent and accurate reports to the directors, and during the time covered by the transactions in controversy the directors had knowledge of and approved the transactions which are alleged to have resulted in the insolvency of the bank.

Mr. Beal's answer denies that he withdrew or had withdrawn any money or property of the bank for the purposes stated, or that he combined with the other defendants, or any one else, to unlawfully abstract any money or property of the bank. He also denies that he had any dealings with the bank, or any accounts, save only as an employee receiving a salary. He denies any necessity for discovery, so far as he is concerned, as he had repeatedly offered to plaintiff all knowledge in his possession, which offers had been declined. He avers that down to August, 1883, he was engaged as a book-keeper having charge of the oil accounts of the bank, in which capacity he acted under the direction and with the knowledge of the officers and directors of the bank; that a large portion of his work was performed, and all his books and accounts of such oil transactions were kept openly and publicly in the directors' room and at the vice-president's desk; that all the money lost to the bank was lost before August, 1883, and before he bought or sold any oil for the bank; that from August, 1883, to May 24, 1884, as an employee of the bank, he bought and sold oil for it as directed from time to time by his superior officers, upon which transactions there was a large profit, all of which was accounted for by him.

The answer of Mr. McMullin denies that he withdrew or had withdrawn any money or property of the bank for the purposes stated, or that he combined with the other defendants or any one else to abstract any money or property of the bank. He denies that his accounts with the bank are complicated, involved and intricate, but avers that his accounts had been adjusted by the plaintiff and showed a balance due him of about $70,000, upon which he had received a small dividend, and

with this exception, he denies that the bank had any accounts, dealings or transactions with him, or in his name, or on any account, with his knowledge, authority or consent. He also denies that any money or property of the bank had come into his possession and denies the plaintiff's right to discovery.

The case involves transactions in oil by what was called in the testimony, the Penn Bank syndicate. These transactions began about May, 1883, and ended with the insolvency of the bank in 1884.

   *     *     *     *     *     *     *     *

The plaintiff seeks to hold the defendants upon the following grounds:

1. Riddle was president of the bank. He was therefore trustee of the bank. In so far as he handled the funds of the bank he dealt with trust funds. Under the proofs in the case, Riddle used the trust funds of the bank in a speculation in oil, by which it was sought to raise or depreciate the market value of oil. This was ultra vires the power given to the bank in its charter, and ultra vires the power of Riddle as president, because without the knowledge and consent of the directors of the bank. McMullin and Beal both knew that Riddle was president, and that the bank was in the syndicate, and that the money of the bank was being used in oil deals. This was an unlawful use of the money, and as they assisted in such use and actually used the funds of the bank themselves, and assisted in extracting such funds for use in the oil deals, they are personally liable, the same as Riddle, for all the money so abstracted, and for all losses in the oil deal; and that Beal and McMullin were liable even if the bank were not a party to the syndicate, because it would still be an unlawful use of the trust funds of the bank.

2. Riddle, however he may be regarded, and irrespective of his trust position, was engaged in an oil deal for the Penn Bank, the purpose of which deal was to raise and depress the market price of oil. The vast amount of oil dealt in, the manner in which it was handled, the fact that in reality the oil was bought on margin, and the other circumstances, show that it was a gambling speculation in oil. So far as the Penn Bank was concerned, both Beal and McMullin were with Riddle, principals. They actively co-operated with Riddle in the gamble for the bank, and as this was ultra vires the charter, and also ultra vires

the power of Riddle, all of the defendants are liable for the losses so sustained by the bank.

3. The defendants were engaged in a combination to raise and depress the market price of oil; in other words, to produce a corner. They were, therefore, engaged in an unlawful act, and are liable for the losses thereby occasioned, whether they did or did not know that the funds of the bank were being used.

Mr. Riddle did not appear before the master, either personally or by counsel, and no testimony was offered on his behalf. A subpœna was served on him in New York to appear and testify for plaintiff, but he failed to appear. There was, therefore, no explanation from him as to his connection with the matters alleged in the bill. Mr. Beal was called for cross-examination, and examined by plaintiff. He, however, failed to appear or offer any testimony in defence, or to otherwise contest the plaintiff's claim. Mr. McMullin appeared personally and by his counsel at all the meetings, and produced testimony on his behalf.

\*     \*     \*     \*     \*     \*     \*     \*

There is no room for doubt as to Mr. Riddle's liability in any aspect of the case. The Penn Bank was a banking corporation engaged in a banking business. Mr. Riddle was trustee for the bank. He used the trust funds to speculate in oil. The bank had no power to do this under its charter. There is no evidence that the board of directors, or any member thereof, except F. B. Laughlin, had knowledge of the fact that the funds of the bank were being so used. The fact that the oil accounts were kept in fictitious names, is evidence that Mr. Riddle not only knew that the transactions were illegal, but intended to conceal them from the knowledge of the directors and officers of the bank. The enormous loss shown to have been sustained by the bank in these transactions is directly chargeable to Mr. Riddle's illegal conduct. . . . .

As to Beal and McMullin there is more room for doubt. The testimony as to Beal shows, as he claims, that he kept the oil accounts, and that the most of his work was done in the bank building; and if there was nothing more than this in the case, there would not be sufficient to make him liable; but by his own testimony it appears that he knew that the Penn Bank's money was being used in the deal, and that the money of the bank was used to margin the oil. It also appears by his own

testimony that he made a loan of $1,000,000 at 6 per cent to carry the oil. He also made charging checks for large amounts against the fictitious accounts, and made deposit tabs in their favor. Mr. McMullin testified that orders to buy were given to him by Beal, and that whilst in New York for the syndicate business he was in constant communication with Beal and Riddle.

The testimony as to Mr. McMullin shows that shortly prior to the commencement of the syndicate dealings he was a broker and dealer in oil; that Mr. Riddle requested his services in connection with the oil deal, and that from the time the purchases began until the close of the first period, when the 3,000,000 sale was made, he had a close connection with the transactions. Nearly all the correspondence relative to the deal, which was in cipher, was addressed to him. He was at the bank consulting with Mr. Riddle relative to the business of the syndicate nearly every day, and generally several times a day. He testifies that he knew the Penn Bank was in the syndicate from the very start, and that he bought and sold oil for the bank, and that the bank put up margins. The testimony also shows his knowledge that the object was to affect the oil market by both advancing and depressing the price of oil and his participation in the consultations looking to that object.

In relation to the purchase and sale of oil for the syndicate, Mr. McMullin acted as a general broker, distributing orders to other brokers to buy or sell. One transaction is shown in which he personally made the purchase and paid for the oil by the check of the bank, but on this transaction there appears to have been a considerable profit, or would have been had the oil been sold whilst the market was advancing. Mr. McMullin did not put any money into the syndicate, yet, although his services would seem to have been very constant and important, and his advice and judgment valuable, yet, so far as appears from the testimony, he received no compensation whatever, nor was there any arrangement that he should receive any. There is no explanation on Mr. McMullin's part as to the consideration for his labors.

It is alleged on the part of Mr. McMullin that his connection with the transactions was open; that the correspondence relative to the business was kept in a room in the bank build-

ing; that the brokers met there daily for orders and consultations, and that the directors of the bank had access to the correspondence and knew that these consultations among the brokers were going on; but if in this case it is at all material as to the knowledge, or means of knowledge, of the directors, the testimony fails to show that the board of directors, or any member thereof, with one exception, knew that the funds of the bank were being used, nor would the correspondence, which was largely in cipher, be likely to inform them, even if read.

### FINDINGS OF FACT.

1. The Penn Bank was originally incorporated by act of April 5, 1872, P. L. 972, under the name "The Safe Deposit and Trust Company," with its place of business at Wheatland, Mercer county, "or such other locality as may be deemed most suitable." In 1873 the place of business was fixed at Pittsburgh, and by proceedings in the Common Pleas of Allegheny county, the name was changed to "The Penn Bank."

2. The said bank from the time at which it began business at Pittsburgh in 1873 was engaged in a regular banking business of discount and deposit, and continued in that business until May 26, 1884, and during that time did a very large business, having at various times deposits exceeding $2,000,000.

3. The said bank became insolvent, and on May 26, 1884, closed its doors, and on May 28, 1884, made a voluntary assignment to Henry Warner, the plaintiff, who accepted the trust.

4. W. N. Riddle, one of the defendants, was cashier of said bank from the commencement of its business in Pittsburgh until 1882, and president from that date until the bank finally closed its doors on May 26, 1884. As president, Mr. Riddle was a salaried officer of the bank, and had control of the other officers and employees of the bank, and superintended and controlled the business of the bank, and had possession and control of the moneys and other assets of the bank.

5. During the year 1883 the said Riddle withdrew, and allowed to be withdrawn, large sums of money belonging to the Penn Bank for the purpose of carrying on an oil deal. This action on the part of Mr. Riddle was an illegal use of the funds of the bank, and was unauthorized by the charter of the bank,

and without the knowledge of the board of directors or any member of the board, except F. B. Laughlin, vice-president. The loss to the bank on this account was $827,091.38, which caused the insolvency of the bank.

6. The object of the deal was to advance the market price of oil from about 90 cents to $1.50 per barrel. There was purchased between the early part of 1883 and of July 18, 1883, about 5,000,000 barrels, and about 3,000,000 sold from time to time. The purchases were made for the primary object of the deal and also to sustain the market. The sales from time to time were made to prevent the market from advancing too rapidly, which it was supposed might defeat the primary object. When the purchases began, the market price was about 90 cents per barrel, and advanced with some fluctuations to $1.24 per barrel, when the market broke and all the oil then on hands and bought under the deal, being about 3,000,000 barrels, was sold at from 98 cents to $1.01 per barrel. No oil was actually received or delivered in the transactions, but certificates representing actual oil in the pipe lines were handled as a general thing. Certificates were purchased from brokers, a check of the bank given for the price, the certificates were then sent East, and ninety per cent borrowed on the certificates, and a margin of ten per cent kept up out of the bank's funds. All the oil was margined in this or some similar manner. The bank's funds were also used to pay brokerage, storage and interest. The brokerage was $1.25 per thousand barrels for buying and selling. The storage was 41⅔ cents per day per thousand barrels.

7. Both Beal and McMullin knew that the Penn Bank's money was being used for the purpose of the syndicate, and that the money of the Penn Bank was being used to margin oil. They both knew that the Penn Bank was a regular banking corporation. They both knew that the object was to advance the price of oil for speculative purposes. They both knew, or ought to have known, that the bank had no power to engage therein. They both aided and assisted Mr. Riddle in the abstraction of the money of the bank for the purposes of the syndicate.

8. At the time of the closing of the bank Mr. McMullin had on deposit in the bank $68,179.26.

### CONCLUSIONS OF LAW.

The inquiry remains as a matter of law as to the liability of Beal and McMullin under the facts as found above.

The use of the funds of the bank was unlawful and unauthorized. If Beal and McMullin did not know this there was sufficient to put them on inquiry, and they are chargeable with what such inquiry would have disclosed. It is indeed difficult to imagine that either of them could suppose that a bank could lawfully engage in such a gigantic speculation, in which more than 4,000,000 barrels were held at one time, and to carry which nearly $4,000,000 was borrowed. When, therefore, they assisted in this deal with the knowledge, or the means of knowledge, as to its unlawful character, it seems to me that the law would hold them liable also with Mr. Riddle for the losses sustained.

Aside from the view of the case above suggested, there is another view, on which I think the defendants are liable. The testimony, particularly of Mr. VanVoorhis and Mr. Vandergrift, shows that the object was to make a corner in oil. This was an illegal object: Morris Run Coal Co., v. Barclay Coal Co., 68 Pa. 173. Beal and McMullin both knew that this was the object; they both actively assisted in the use of the money of the bank for this illegal purpose. All the parties were guilty of a conspiracy. The bank itself not being a party, its assignee may recover the loss from the conspirators.

I therefore recommend a decree against the defendants for the loss sustained by the bank by reason of the transactions in oil during the period ending July 18, 1883. This amount is $827,091.38. As Mr. McMullin had on deposit in the bank, at the date at which it closed, the sum of $68,179.26, this amount should be deducted from the amount otherwise due by him, leaving his amount $758,912.12.

Various exceptions filed by the defendant McMullin to the report of the master were overruled by him and on the filing of his report were renewed before the court. On September 15, 1888, these exceptions having been argued, the court, without opinion filed, entered a decree: "1. That the master's report is confirmed and the exceptions thereto are overruled. 2. That said defendants are jointly and severally indebted to

and shall pay to Henry Warner assignee, the plaintiff, the sum of $758,912.12 with interest from August 1, 1883; and that said defendants, W. N. Riddle and John P. Beal are jointly and severally indebted to and shall pay to said plaintiff the further sum of $68,179.26 with interest from August 1, 1883. 3. That defendants pay all costs, including the master's fee."

Thereupon the defendant, McMullin, took this appeal, specifying that the master erred:

.1. In omitting to find that upon purchases of oil ordered by W. N. Riddle through M. K. McMullin, certificates for the oil so purchased were actually delivered and received by the Penn Bank, and that these certificates represented actual oil in the pipe lines, deliverable to the holder on demand.

2. In omitting to find that upon the oil purchased on orders received by McMullin from W. N. Riddle there was a clear profit, and that such profit was received by the bank.

3. In finding that the purchases of oil upon orders issued by Riddle and delivered by McMullin to the brokers, were marginal or gambling contracts.

4. In omitting to find that McMullin did not know, until after the failure of the bank, of the existence of overdrawn or fictitious accounts, or that the directors did not know of such purchases of oil or of such overdrawn and fictitious accounts.

5. In finding that McMullin knew, or ought to have known, that the bank had no power to buy oil and was put upon inquiry as to whether the directors had authorized it to be done.

6. In finding McMullin was guilty of conspiracy, and that he is liable for the consequential losses caused by all persons engaged in the purchase of such, whether he knew of such purchases and whether made before or after he was connected with the Penn Bank syndicate.

7. In maintaining jurisdiction in equity as to McMullin, further than to require him to account for all money and property of the Penn Bank received by him.

*Mr. John Dalzell* and *Mr. W. F. McCook*, for the appellant.

As to conspiracy, counsel cited: Burton v. Fulton, 49 Pa. 151; Vanarsdale v. Laverty, 69 Pa. 103; Mann's App., 18 Pa. 249. As to gambling transactions: Smith v. Bouvier, 70 Pa. 325.

*Mr. D. T. Watson* (with him *Mr. A. M. Brown, Mr. H. A. Miller, Mr. S. A. McClung, Mr. Jas. H. Reed* and *Mr. Phil. C. Knox*), for the appellee.

Upon the conclusiveness of the findings of a master, approved by the court, counsel cited: Harland's Accts., 5 R. 323; Ludlam's Est., 13 Pa. 188; Gossner's Est., 6 Wh. 403; Bicking's App., 2 Brewst. 230. As to gambling transactions: Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. 187; Brua's App., 55 Pa. 299; Patterson's App., 13 W. N. 155; Fareira v. Gabell, 89 Pa. 91; Ruchizky v. De Haven, 97 Pa. 202; Morawetz on Corp., 2d ed., §§ 580, 591, 595, 606–7, 609; Bayard v. F. & M. Bank, 52 Pa. 232; Bohlen's Est., 75 Pa. 304; Guillou v. Peterson, 89 Pa. 163.

OPINION, MR. CHIEF JUSTICE PAXSON:

The specifications of error from one to six, inclusive, allege that the master erred in his findings of fact. Moreover, they are not properly assigned, being to the action of the master and not of the court, and might well be dismissed for that reason alone. All of the master's findings, however, have been approved by the court below, and are entitled to the weight of the verdict of a jury. While there was conflicting evidence upon some of the questions of fact involved, and I am not sure, were the testimony before me as a master, that I would not have found one or two of the facts the other way, there was evidence sufficient to submit to a jury, and we are not prepared to say, at this stage of the proceeding, that the master erred in his findings. They are not so palpably erroneous as to justify us in setting them aside.

The seventh assignment gives us more difficulty. It goes to the jurisdiction. I doubt whether the jurisdiction can be sustained upon the ground that Riddle was a trustee. It is true he was the president of the Penn Bank, and there are expressions in the books which indicate that to some extent such officers are trustees of the corporation's funds. But they are quasi trustees merely; not technical trustees, over which equity has jurisdiction. The term "trust" is a very comprehensive one. As was said by Chancellor KENT, in Kane v. Bloodgood, 7 Johns. Ch. 90, cited in Yorks's App., 110 Pa. 79: "Every deposit is a direct trust. Every person who receives money

to be paid to another, or to be applied to a particular purpose, is a trustee.   The cases of hirer and letter to hire, borrower and lender, pawner and pawnee, principal and agent, are all cases of express trust," etc.   It has never been held, however, that these and the like cases are such technical trusts as to bring them within our limited equity jurisdiction.

While the case is extremely close, we think the jurisdiction can be sustained, upon the ground that the remedy at law is inadequate.   That there is a remedy at law is not denied. That, however, is not alone sufficient to oust the jurisdiction of equity.   There must not only be such remedy, but it must be an adequate one, and reasonably convenient.   A glance at this case is sufficient to show that the remedy at law would be inconvenient, if not inadequate.   It would be difficult to reach all of its ramifications upon a jury trial.   There is such a mass of accounts and complications that it would be next to impossible for a jury to reach an intelligent result.   While the case is on the very border line of the jurisdiction, we have come to the conclusion, after much reflection, that the remedy at law is inadequate.

The decree is affirmed, and the appeal dismissed at the costs of the appellant.