Conemaugh Gas Company v. Jackson Farm Gas Company, Appellant.

186  443
190  175

186        443
21 SC  2  87

186      443
f 31 SC 2526

186      443
f 36 SC 2358

*Referees—Findings of fact by—Review—Practice, Supreme Court.*

A referee's finding of fact sustained by the court below will not be reversed by the Supreme Court unless exceptions specify the deficiencies in it, and show that it is legally insufficient to sustain the result of which complaint is made. Alleged errors to conclusions of law which are applicable to and in conformity with findings of fact which have been sustained are only indirect attacks, after a direct attack has proved fruitless.

*Equity—Jurisdiction—Convenience of remedy.*

A bill in equity may be sustained solely on the ground that it is the most convenient remedy: Appeal of Brush Electric Co., 114 Pa. 574. This is especially so where the remedy afforded by a court of law is obviously inconvenient and of doubtful adequacy.

*Equity—Jurisdiction—Specific performance—Contract to supply natural gas—Defense based on defendant's unlawful act.*

A court of equity has jurisdiction to specifically enforce a contract to supply natural gas.

A contract by a natural gas company organized under the laws of Pennsylvania, by which it is agreed that all of the surplus gas of the company shall be sold and delivered to another company, may be specifically enforced.

The law does not look with favor upon a defense based on the unlawful act of the party interposing it.

Argued Nov. 8, 1897. Appeal, No. 70, Oct. T., 1897, by defendant, from decree of C. P. No. 1, Allegheny Co., Dec. T., 1895, No. 398, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, DEAN and FELL, JJ. Affirmed.

Bill in equity to specifically enforce a contract to supply natural gas.

The case was referred to Thomas Patterson, Esq., who reported the facts to be as follows:

### FINDINGS OF FACT.

1. The Jackson Farm Company, prior to the making of the contract of October 12, 1894, with the Conemaugh Company, had a number of producing wells in Armstrong county, the gas from which it supplied at wholesale largely to two consumers, the West Penn Gas Company and P. H. Laufman & Co., Limited.

2. At that time the Conemaugh Company was engaged in supplying gas from its own wells to consumers in the borough of Avonmore, Westmoreland county, and Saltsburg and Blairsville in Indiana county.

3. The supply from the wells of the Conemaugh Company was not adequate for the consumption of its patrons, and for the purpose of securing a sufficient supply, both to accommodate its consumers and to increase its business, it applied to the Jackson Farm Company to make necessary arrangements to purchase a part of its surplus over what was needed to supply its other contracts.

4. In the negotiations leading up to the contract it was stated

by the officers of the defendant company that they had a large supply of gas, estimated by them to be about 12,000,000 cubic feet per day. The officers of the plaintiff company stated that they would need a large supply of gas, anticipating that they would take on additional business, and that the daily amount they would likely need would be five or six million feet. These statements on both sides were made in good faith, and expressed the honest convictions of the officers as to the respective capacities and needs of their companies.

5. It was also a matter of discussion at that time as to which party should lay the supply pipe connecting the Avonmore station with the wells of defendant company. If laid by the defendant they wanted four cents a thousand for their gas. It was finally agreed, as stated in the contract, that this line should be laid and owned by the Conemaugh Company.

6. The nearest point of the system of pipes of the plaintiff to the wells of the defendant was the borough of Avonmore. The distance was some four miles and was intersected by the Kiskiminetas river, at a distance of some three miles from Avonmore. The plaintiff company laid an eight-inch gas main from its Avonmore lines to a point about one hundred feet distant from the wells of the defendant. The connection with the wells was then made by the defendant.

7. There was much conflicting testimony on the question as to the condition of the supply pipe from the wells of the defendant company to the station at Avonmore; the witnesses varying to the extreme in the matter of opinion as to the extent of the leakage and the manner in which the line was laid and maintained. The most conservative estimate was given by S. W. Day, an employee and witness of defendant, who, at its request, had made a careful examination of the leaks about May 1, 1895. This testimony indicates that while there were a number of noticeable leaks, the aggregate of these leakages amounted to some 22,800 feet in every twenty-four hours. There were a number of smaller leaks at the collars, where the gas could be just heard escaping, but the witness could not say how many of these there were, as he paid no attention to them. The line was a surface line laid of second-hand pipe, and carrying gas at a pressure of from seventy to eighty pounds on the average. The referee finds that the supply main from the wells to

Avonmore leaked to some extent, but not more than might reasonably be expected of a surface line carrying gas at a high pressure.

8. From time to time the superintendent and other employees of the plaintiff company went over the line to inspect it and make necessary repairs. Owing to the fact that the line lay on the surface of the ground, much trouble was experienced in keeping the leaks closed, as the expansion and contraction of the line loosened the lead filling under the sleeves, which were put over the larger leaks, and caused the gas to break out again. The superintendent of the Conemaugh Company at one time requested the superintendent of the Jackson Farm Company to take his own men and put the line in repair at the expense of the former company. This was accordingly done. The referee finds that the plaintiff company, through its officers and employees, used due diligence in endeavoring to repair and maintain the supply main in proper condition.

9. The line broke twice in the Kiskiminetas river, by reason of the high water in that river carrying out the section of the line which crossed it. The first of these breaks was on March 1; the second on April 9. On each occasion notice was sent as promptly as possible to the employees of the defendant company, and the gas turned off without unnecessary delay.

10. The system of mains and pipes of the plaintiff company was so arranged that by placing gates at certain points of intersection, the field supplied could be divided into two separate parts, and the gas supplied by the defendant company could be run through certain lines and supply certain consumers without mingling with the gas of the plaintiff company, which could thus be used to supply the remaining consumption. This arrangement of gates was perfected on February 1, 1895. After this date the gas supplied by the two companies did not intermingle, but was used to supply separately the consumers set apart to each.

11. After this separation was affected the plaintiff company made its monthly settlements and payments to the defendant company on the basis of the meter readings of the consumers of the plaintiff. The defendant sent its employees with those of the plaintiff to ascertain that these meter readings were correctly taken.

12. When gas was about to be first delivered under the contract, that is, about November 1, 1894, the officers of the plaintiff stated to the officers of the defendant that they need not purchase a meter for the present, until the plaintiff could ascertain whether or not it could then separate its own gas supply from that of the defendant. In accordance with this notice or statement, the defendant hired or borrowed a meter, and used same for temporary purposes. Afterwards, about December 1, 1894, the plaintiff's officers notified the defendant that they could not make the separation as expected, and that the defendant should go ahead and procure the meter as provided for in the contract. The defendant, in accordance with this latter notice, at once gave an order for a proportional meter to be placed at Avonmore, at a cost of about $2,000.

13. The meter placed at Avonmore was used to measure the gas delivered from the defendant to the plaintiff company. Any leakages on the line from Avonmore to the wells came out before the gas was measured. It was what was known as a proportional meter, being arranged on a system by which the gas was separated in the meter, a fractional part, one per cent or two per cent, measured separately, and from the tally kept of these measurements and by proper multiplication the whole volume of gas passing through the meter could be determined. The meter was tested before being put in place and found to be accurate, and again tested on May 6, 1895, and found to be accurate. It is, of course, impossible to say with certainty that the meter made no mistakes, or that no mistakes were made in taking and reducing the reading. The presumptions, however, are all in favor of the fact that the meter accurately measured the gas delivered through it. The referee finds that the proportional meter placed by the defendant company at Avonmore, was, so far as the tests and evidence in the case can make the fact appear, accurate in its measurement of gas delivered through it to the plaintiff company.

14. After February 1, 1895, although, as found above, the readings of the meters of the plaintiff's consumers were taken as the basis of settlement and payment with the defendant company, yet the latter company still continued to measure the gas delivered to plaintiff through its proportional meter, and to preserve a record of these measurements.

15. The measurements of gas as delivered through the pro-portional meter of the defendant and the measurements of gas as taken from the readings of the consumers' meters of the plaintiff did not agree; the former showing a much larger volume delivered than the latter showed consumed. The details of these differences are given in the next finding.

16. From February 1, 1895, to February 21, 1895, the meter readings of the plaintiff company showed a consumption of 28,384,000 feet. From February 1, to 1 P. M. on February 16, the meter of the defendant company showed a delivery of 23,464,000 feet. On that day the recording tally of the meter was removed, and no actual record of the gas delivered through the remainder of the month was kept. It was estimated, how-ever, by the treasurer of the defendant company, that the aggre-gate of gas delivered through the month was 43,995,000 feet. On March 1 the line was broken in the river, and no gas was de-livered until March 19 at noon. From this time until April 1, the measurements of the plaintiff company aggregrated 3,716,000 feet. The meter of the defendant showed a delivery through the same period of 8,764,000 feet. From April 1 to April 9, when the line finally broke, the plaintiff company's meters showed a consumption of 2,742,857 feet; the defendant's meter for the same period showed a delivery of 5,731,000 feet. So that on April 9, 1895, when gas ceased to be delivered, the meter of the defendant showed that since February 1, 1895, there had been delivered 23,287,143 cubic feet of gas more than that which was registered by the meters of the plaintiff's con-sumers.

17. There is no explanation to be found in the testimony for the variation between these two sets of meter reading. There have been various conjectures or suggestions, but there is noth-ing in the testimony upon which a finding of fact can be based adequate to explain the large difference between the measure-ment by consumption and supply.

18. There were certain free consumers on the plaintiff's line, who received gas without charge, in consideration of the grants of rights of way, or similar franchises. These free rights con-sisted of some thirteen farms, twenty-three street lamps and the town hall at Saltsburg.

19. While there is no reason to doubt the sincerity of the

belief of the officers and superintendent of the Conemaugh Company, that they had communicated the fact to the officers of the Jackson Farm Company that they were supplying certain consumers with free gas, before the execution of the contract, yet in view of the positive denial of the officers of that company that they had received any such communication, and in view of the fact that the preliminary negotiations took place between a number of different people and at different times, so that such a matter might readily be misapprehended, the referee finds that the officers of the defendant did not know, at the time of the execution of the contract, that the plaintiff company was supplying certain consumers with free gas.

20. The entire consumption of gas from the time when it was first delivered by the defendant company, viz: November 12, 1894, down to April 1, 1895, according to the measurements of the plaintiff company, had been 135,967,330 cubic feet, or a per diem average for the 140 days of 971,195 cubic feet.

21. On March 27, 1895, the plaintiff company declared a daily minimum, which, under the terms of its contract it was bound to declare before April 1, 1895, of 700,000 feet. In the same letter it stated to defendant that it hoped to be able to take its entire product in excess of the supply to P. H. Laufman & Company, Limited.

22. To this notice the defendant company replied on March 28, acknowledging the receipt of the letter containing the notice, and stating in addition that it, the defendant company, had several million cubic feet per day to sell, which it could not hold. That it would give plaintiff the preference as to everybody except P. H. Laufman & Company, Limited, but asking it to exercise its preference at once, as the defendant must soon make contracts for future sales.

23. An extended and spirited correspondence resulted. It would hardly be fair to either party to attempt to summarize the contents of the several letters which are spread in full upon the notes of testimony. Briefly noting the outline of the controversy, it appears that the first subject of discussion was the meaning of the word "preference" used in the contract, the plaintiff contending that this gave it the right to draw on the surplus of the defendant whenever it saw proper, the defendant contending that it merely gave the other party the right

to an offer of the gas at the same price which a third party might offer for it, before a contract could be closed with such third party. In a letter of May 17, 1895, Mr. Eaton, president of the defendant company, directs attention to the fact that according to his computation the declaration of the minimum is insufficient, that it should be for 1,074,000 cubic feet; that the supply line was defective and leaking badly; that the meter-readings of the two companies varied greatly, showing a loss to his company of nearly sixty per cent of the gas delivered; that the defendant company would place a meter at the end of its line and measure the gas there; that the plaintiff must pay for the March gas according to the meter of the defendant; and that, for the last time, it offered plaintiff a preference for all the gas it would take. This letter also inclosed a certificate of the test of the proportional meter. The reply of Mr. Stone, president of the plaintiff company, of the date of May 30, 1895, after discussing the subject of the preference, refers to the declaration of the minimum, and while assenting to its correctness, suggests that it is a matter for conference between the treasurers of the two companies. It denies that the supply line was in bad or leaky condition, and asks that attention be called to any leaks that may be known to exist. It states that while the contract called for measurement by the meters of the consumers of plaintiff, yet the discrepancy was so large as to call for careful investigation, and it was suggested that the treasurers of the two companies might take it up and bring about a satisfactory settlement; that if other matters were arranged it might be that the clause providing for measurement by consumers' meters might be abrogated, and that the writer would recommend that it at least be waived until the cause of the March discrepancy be ascertained. On June 15, a proposition from the defendant was sent by Mr. Eaton, proposing a division of the discrepancy in the account of gas furnished, the plaintiff paying for one half; all gas furnished thereafter to be paid for accordingly to the defendant's meter reading; the meter to be replaced at Avonmore, provided the plaintiff would permit the defendant company to put the line in proper order and maintain same at their expense; the plaintiff to pay for the daily minimum of gas when not actually taken in any month on the 18th of the next month, the over-payments to apply on future month when more than the daily average was taken.

The first clause of this proposition, viz: as to the division of the discrepancy, was accepted by the plaintiff company in a letter of June 28, which also stated that there had not been time at the meeting of the board of directors to take action on the remaining clauses. To this letter the Jackson Farm Company replied on June 29, stating that their proposition of June 15 must be accepted in its entirety or not at all. On August 27, 1895, the plaintiff made a demand on the defendant company for 1,000,000 feet of gas daily from September 1, then ensuing. On the 28th of the same month the defendant replied that the plaintiff company had forfeited all its rights under the contract of October 12, 1894; and asking to be informed when and at what rate the gas would be paid for, how measured, and whether 1,000,000 feet would be their daily minimum.

This outline seems necessary to give some explanation of the nature of the controversy between the parties, though the details of the letters will have to be referred to in particular matters. The termination of the correspondence is the only fact which need be specifically found in this connection.

The referee accordingly finds that the correspondence between the parties terminated in a demand for gas by the plaintiff on August 27, 1895, which was refused by the defendant on August 28.

24. During the period of this correspondence, there were a number of interviews between the officers of the respective companies, in which the points of dispute were gone over and mutual suggestions of compromise made. The last of these was some two weeks after August 3, 1895, when Mr. Stone called on Mr. Eaton with reference to the acceptance of a proposition made by the latter in a letter of that date to the former. Mr. Eaton then informed Mr. Stone that this proposition was no longer binding, and that it was accordingly withdrawn. This terminated the conferences between the parties.

25. After the notification by the defendant that the contract of October 12, 1894, was terminated, the plaintiff took up a portion of the supply main between Avonmore and the Anderson Farm, and used it for the purpose of making connection with other sources of supply. This line could have been relaid in place in some two days.

26. The plaintiff company made payments to the defendant

company of the gas actually supplied according to its, the plaintiff company's, measurements, except a settlement of a discrepancy which appears in the correspondence of March 20, amounting to some $37.00, and which does not appear to have been paid for.

27. After the termination by the defendant company of its contract with plaintiff, by letter of August 28, 1895, the plaintiff made certain expenditures in order to obtain a supply from other sources, and to render more available the supply that it then had. These expenditures were as follows :

(*a*) It drilled two wells on a block of gas leases which it owned, and which turned out to be nonproductive, at a cost of . . . . . $4,000

(*b*) It relaid with larger pipe a considerable portion of its line at a cost of . . . . 3,000

(*c*) It put in a blower for the purpose of forcing gas through its lines by means of artificial pressure, at a cost of . . . . . . 2,500

28. The daily minimum of 700,000 cubic feet, declared by letter of March 27, 1895, has never been paid for by the plaintiff.

29. The improvements or changes made by plaintiff after the termination of the contract of October 12, 1894, were those proper to be made for securing a better supply or a more perfect distribution of gas, and were the expedients which would naturally have been resorted to by the plaintiff company for these purposes, upon the full expiration of the term of its contract with the defendant company.

30. From April 9, 1895, the date when the last gas was furnished, through the full period of the contract, that is down to July 1, 1896, the defendant company had a supply of gas, over and above the amount necessary to fulfil its contract obligations with P. H. Laufman & Company, Limited, of more than 700,000 cubic feet per day.

31. During the same period the plaintiff company had actual consumers for gas to an amount in excess of the daily minimum of 700,000 cubic feet.

32. The average price received from its consumers by the plaintiff company for gas retailed to them was eight cents per thousand cubic feet.

33. After the termination of the contract by the act of the defendant company, the plaintiff company cut off from its line, and ceased to supply the consumers in the town of Blairsville. There was a saving of expense to the plaintiff company in cutting off this supply, not counting the profits earned by the supply, of $500 per month.

These appear to be all the questions of fact in any way important or material to a consideration of the legal and equitable questions involved.

The referee found as a matter of law that equity had jurisdiction to specifically enforce the contract; that the contract was not illegal or unreasonable, and that the complainant was entitled to a decree for $9,183.42.

The court sustained the referee's findings of fact and conclusions of law, and entered a decree in accordance with the report.

*Errors assigned* were in not sustaining the exceptions to the referee's findings of fact and conclusions of law, and the decree of the court.

*J. S. Ferguson* and *James C. Boyce*, for appellant.—The least taint of illegality or want of equity will preclude a decree in a case like this : Gaines v. Molen, 33 Fed. Rep. 27.

Equity will not enforce contracts, even if good at law, if their terms be at all hard, or even complex ; such decrees are of grace, and not of right : Keeler v. Taylor, 53 Pa. 467 ; Weise's App., 72 Pa. 351 ; W. & W. Ry. v. L. & N. W. R. R., Law Rep. 16 Eq. Cases, 439 ; Oil Creek R. R. v. A. & G. W. R. R., 57 Pa. 65 ; Wistar's App., 80 Pa. 484 ; Cathcart v. Robinson, 5 Pet. 264 ; King v. Hamilton, 4 Pet. 311 ; Miss. & Mo. R. R. v. Cromwell, 91 U. S. 643.

*A. Leo Weil*, with him *Charles M. Thorp*, for appellee.—The court had jurisdiction : Milkman v. Ordway, 106 Mass. 232 ; Case v. Minot, 158 Mass. 577 ; McGowin v. Remington, 12 Pa. 56 ; Walters v. McElroy, 151 Pa. 549 ; Allison's App., 77 Pa. 221 ; Winton's App., 97 Pa. 385 ; Socher's App., 104 Pa. 609 ; Adams's App., 113 Pa. 449 ; Drake v. Lacoe, 157 Pa. 17.

The affirmance by the court below of the referee's findings of fact is generally as conclusive as the verdict of a jury on the

facts: Bulkley v. Wood & Co., 4 Pa. Superior Ct. 391; Phila.
Co. v. Improvement Co., 180 Pa. 235; McGinn v. Benner,
180 Pa. 396.

OPINION BY MR. JUSTICE McCOLLUM, July 21, 1898:

The assignments of error from the first to the tenth, inclu-
sive, are based upon and call in question the correctness of the
referee's findings of fact. Presumably the findings were au-
thorized by the evidence, and the presumption that they were
is strengthened by the clear, concise and obviously impartial
report in which they appear, and by the approval of the report
by the court, after full argument upon and due consideration
of the exceptions to it. A careful reading of the voluminous
testimony in the case having satisfied us that the findings
referred to were clearly warranted by it, an elaborate discussion
of it is not called for. It is shown by many decisions of this
court that the party complaining of the verdict of a jury or the
findings of a master, auditor or referee, as unauthorized by the
evidence, must specify the deficiencies in it and show that it is
legally insufficient to sustain the verdict or findings of which
complaint is made. In the case at bar a strenuous effort was
made to convince us of error in the findings referred to, but it
was unsuccessful because, as we have seen, they were sus-
tained by the evidence.

The referee's conclusions of law appear to be applicable to
and in conformity with the facts as found, and the alleged
errors in them are mainly predicated upon the alleged errors in
his findings of fact. To the extent that this contention is
dependent upon errors in the findings of fact it needs no con-
sideration, because it is only an indirect method of attacking
them after a direct assault has proved fruitless.

The defendant's printed argument is mainly devoted to the
support of the proposition that the case is not within the juris-
diction of a court of equity, and that if it is technically cog-
nizable there, the evidence should have induced the chancellor
to dismiss the plaintiff's bill, and thus referred the parties to
another tribunal for an adjustment of their disputes. We do
not assent to this view of the case. There is certainly no rea-
sonable ground for denying that in view of the nature and
subject-matter of the controversy a court of equity affords the

most convenient remedy for a just disposition of the questions involved in it, while the remedy afforded by a court of law is obviously inconvenient, and the adequacy of it is at least doubtful. In the appeal of the Brush Electric Company, 114 Pa. 574, Mr. Justice Gordon said: "A bill may be sustained solely on the ground that it is the most convenient remedy." In support of this statement he cited Kirkpatrick v. McDonald, 11 Pa. 393. See also on this point Drake v. Lacoe et al., 157 Pa. 17, and Warner v. McMullin, 131 Pa. 370. The cases of Whiteman v. Fayette Fuel-Gas Co., 139 Pa. 492, and Sewickley Borough School District v. Ohio Valley Gas Co., 154 Pa. 539, are also in point.

We do not concur in the argument or suggestion that the contract between the parties is against public policy and therefore the defendant company should be relieved from its liability for what is justly due the plaintiff upon it. In the first place, it has not been shown that the contract is violative of any provision of the law applicable to it, and this by itself is a sufficient answer to the suggestion. Besides, the law does not look with favor upon a defense based on the unlawful act of the party interposing it.

The case was carefully tried by the learned referee who appears to have fairly considered and passed upon all the questions of law and fact raised before him. These questions are substantially raised by the assignments before us. As we are not able to discover in his findings of fact or conclusions of law any ground for reversing the decree recommended by him we overrule the assignments.

Decree affirmed and appeal dismissed at the costs of the appellant.