# Drake et al., Appellants, *v.* Lacoe et al.

*Mines and mining—Miners' weight.*

Miners' weight in the absence of evidence of an agreement as to a different meaning, is such quantity of coal as is computed at a ton in paying the miner who mines by the ton.

*Coal lease—Acquiescence in construction of contract.*

A lessee in a coal lease agreed to pay ten cents per ton, " miners' weight " for all coal mined. The master found that from the evidence it appeared that the phrase " miners' weight " meant such quantity of coal, slate and dirt as was agreed upon between the operators and miners to be sufficient to make a ton of prepared coal. It appeared that about twenty per cent of the mine wagon's contents was deducted as worthless. The miner was paid for the remainder as coal. The lessees paid royalties on the number of tons of coal prepared for the market in this way. The lessors received full statements of the coal thus mined during all the years that returns were made to them, and made no objection as to their accuracy

until suit was brought.   *Held* that the parties having thus interpreted the contract, lessors could not recover for a greater number of tons.

*Assignment of lease—Privity of estate.*

An assignment of a lease for an increased consideration, with wholly new stipulations, with right of re-entry for conditions broken, with an express assumption of continuing liability of the assignors to the owners under the original lease and a manifest intention to sublet, will not destroy the privity of estate between the lessors and lessees.

*Lease—Royalties—Laches—Practice—Equity.*

On a bill in equity for an account of royalties under a coal lease, defendants cannot allege at the oral argument before the court, that their privity of estate with plaintiffs had been terminated by an assignment of the lease, when no such defence was set up by demurrer, or in the answer, or in the proceedings before the master.

*Forfeiture of lease—Laches—Equity.*

After a delay of twelve years equity will not decree the forfeiture of a coal lease for nonpayment of royalties.

*Equity—Jurisdiction—Accounts.*

After full hearing of a bill in equity upon exceptions to a master's report, and after heavy costs have been incurred, a doubt as to equitable jurisdiction is not sufficient to oust it.

Where it appears, from the averments in a bill in equity and the copies of the contract, as if a final decree could be had only after the investigation of complicated accounts running through many years, the bill will not be dismissed because the evidence before the master discloses that no accounting was necessary, and that plaintiffs had an adequate remedy at law.

Argued Feb. 23, 1893.   Appeal, No. 133, Jan. T., 1893, by plaintiffs, Thomas Drake et al., from decree of C. P. Lackawanna Co., Nov. T., 1888, No. 3, dismissing bill in equity against R. D. Lacoe, J. B. Shiffer and John Jermyn, defendants.   Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ.

Bill in equity for account and for forfeiture of coal lease.

The case was referred to W. W. Lathrope, Esq., as master, who reported the facts and conclusions of law as follows :

" 1. By an indenture of mining lease, dated the 28th day of November, 1863, and recorded, Charles Drake, then the owner of the 78 acres of land described in the plaintiff's bill, did lease and let unto Ralph D. Lacoe and J. B. Shiffer, defendants, all the coal in said land, except the upper vein.

" 2. The habendum clause in said lease is as follows : ' To

have and to hold the same to the said parties of the second part, their heirs, executors, administrators and assigns, for the term and period of ten years, and for such other and further time as the parties of the second part and their legal representatives shall continue to pay the rent, as named in this instrument, unless the time is sooner ended by nonpayment of rent as hereinafter provided for.'

" And there is also contained in said lease a stipulation in the words following, to wit: ' And it is further understood and agreed that if at any time an instalment of rent shall become due and remain unpaid for the space of six months, in that case the term of this lease shall be at an end, and the rights and liabilities of the lessees and their legal representatives and assigns under this instrument, either at law or in equity, shall absolutely cease and be determined, and the party of the first part may thereupon resume possession of said premises, and of all the permanent improvements thereon.'

" 3. By an assignment in writing dated 27th February, 1865, and recorded, said Lacoe and Shiffer, defendants, transferred their rights under said lease to James Ritchie and Hugh W. Green.

" 4. By an indenture of mining lease, dated the 13th day of April, 1865, and recorded, the said Charles Drake did lease and let unto the Massachusetts Coal Company, all the coal reserved in the above recited lease to Lacoe and Shiffer, to wit, the upper vein of coal in the land aforesaid; in consideration whereof the said company covenanted and agreed to pay the said Charles Drake, semi-annually, a rent or royalty of ten cents per ton, miners' weight, on all merchantable coal mined from said vein on the said land, and also to deliver to said Drake, his heirs or assigns, free of cost, fifty tons of lump or prepared coal as he might elect, annually for each and every year during which said company should work said vein of coal.

" 5. The said last recited lease contains this stipulation, to wit: ' And it is further agreed that this lease shall be subject to the provisions in the lease from said Drake to Lacoe and Shiffer, so far as it relates to its continuance, the payment of taxes and the inspection of books, as well as in the conducting of the mining operations in a workmanlike manner.'

" 6. There is nothing contained in the lease last recited requiring the lessee to mine by any special process.

" 7. By an assignment in writing, dated 21st August, 1865, and recorded, James Ritchie and Hugh M. Green, assignees of Lacoe and Shiffer, as set forth in the third finding of fact, transferred to the Massachusetts Coal Company aforesaid, all their rights in the first lease.

" 8. By deed dated the 1st day of November, 1869, and duly recorded, the Massachusetts Coal Company conveyed unto R. D. Lacoe, one of the defendants, all their rights in the said 78 acres of land, and also all their rights under the two mining leases above recited.   In some way that does not appear, J. B. Shiffer, another of the defendants, acquired part of the lease-hold rights vested by said conveyance in R. D. Lacoe.

" 9. By an indenture of mining lease dated 25th May, 1871, and recorded, R. D. Lacoe and J. B. Shiffer, defendants, together with O. F. Gaines, did sublet all the coal aforesaid, together with coal under other lands, to the Glenwood Coal Company, who continued in possession until 1877, when their property was sold at sheriff's sale.

" 10. Said Lacoe and Shiffer, defendants, again acquired title to said leasehold rights, and by lease dated April 1st, 1887, sublet the same to John Jermyn, also named as a defendant, and Joseph J. Jermyn, who are now in possession of the premises.

" 11. The said Charles Drake died on the 21st day of February, 1873, leaving a will by which he gave his residuary estate, including the land aforesaid, to his four sons, Ebenezer Drake, Thomas Drake, George K. Drake and Lyman Drake, the plaintiffs.   The interest of said Lyman Drake in said land and leases was sold by the sheriff and conveyed to said R. D. Lacoe by deed dated 10th May, 1879, and by said Lacoe conveyed to M. W. Morris and Isaac Everitt, who are named in the bill as use parties.

" 12. During the years 1871, 1872, 1874, 1875 and 1876, while the Glenwood Coal Company were in possession of said premises, under the lease to them from the defendants, Lacoe and Shiffer, the said company mined from the upper vein aforesaid 27,868 tons and 12 cwt. of coal, for which no payment has been made to Charles Drake, or to his devisees, or legal representatives, or to any of the plaintiffs.

[" 13. Full statements of the coal thus mined were rendered

by the defendants, Lacoe and Shiffer, to Charles Drake in his lifetime, and afterward to the plaintiffs, or to some of them. No objection as to their accuracy was made until shortly before the bringing of this suit. The objection then made was that while they showed the number of tons of prepared coal, they did not show the number of tons, 'miners' weight,' as called for by the lease. The amount of coal which the plaintiffs have stated in their bill as mined from their property, they obtained from the statements furnished them as aforesaid.] [2]

["14. Under all the evidence, the phrase, 'miners' weight,' in 1863, and during the years when the said coal was mined by the Glenwood Coal Company, meant such quantity of coal, slate and dirt, as was agreed upon between the operators and the miners to be sufficient to make a ton of prepared coal.] [3]

"15. No coal has been mined by the defendants, or their predecessors in title, from the lower veins, under the first lease, excepting about 767 tons, and none from the upper vein embraced in the second lease, excepting the 27,868 tons 12 cwt. aforesaid.

"16. From the date of the first lease, to wit: Nov. 28, 1863, until the time of filing the bill in this case, the full minimum royalty provided in said lease, to wit $500 per annum, was paid. The aggregate amount of these payments is such, and at all times has been such, as to exceed the royalties for all coal actually mined under both leases, were they so applied.

"17. Prior to October 1, 1880, receipts were given by the plaintiffs for the minimum royalties payable under the first lease, but no receipt was given for royalties on coal mined from the upper vein under the second lease, unless a receipt given April 9, 1875, be so construed. The receipt is in the words following :

"'OLD FORGE, April 9, 1875.

"'Received of R. D. Lacoe, two hundred and fifty dollars, being for the twenty-second semi-annual payment of lease of coal, dated Nov. 28, 1863, given to Shiffer & Lacoe, and supplement given to Massachusetts Coal Company.

"'$250.00                    E. DRAKE, Exetor.'

"18. On February 18, 1880, a written agreement was entered into between Thomas Drake, Ebenezer Drake and George K. Drake, plaintiffs, and R. D. Lacoe (defendant), vendee of

Lyman K. Drake, of the one part, and R. D. Lacoe and J. B. Shiffer (defendants), of the other part, reciting the two leases aforesaid, and stipulating that coal from other properties might be mined through the land of the parties of the first part, and granting the use of a portion of the surface for depositing culm, etc. Nothing is said in this agreement about coal royalties.

"19. On the same day, February 18, 1880, Thomas Drake, one of the plaintiffs, told R. D. Lacoe, one of the defendants, that they, the plaintiffs, had not been paid for the coal mined from the upper vein.

"20. After October 1, 1880, down to October, 1887, the semi-annual installments of the minimum royalty, payable under the first lease, were generally receipted for as applying on said first lease, 'and the supplement and modification thereof,' or 'the supplements thereto,' or 'the supplementary agreements thereto." One receipt was as follows:

"'Received, Old Forge, April 15, 1885, of R. D. Lacoe One Hundred and Eighty-Seven 50-100 Dollars, being the portions of Ebenezer Drake (62.50), George K. Drake (62.50), and Thomas Drake (62.50), in installment of rent due April 1st, 1885, on lease made by Charles Drake in his lifetime to R. D. Lacoe and J. B. Shiffer, and to the Massachusetts Coal Company, now assigned to Lacoe and Shiffer, being in full of rent to April 1st, 1885, on said leases and supplementary agreements.' Signed by Ebenezer Drake, George K. Drake and Thomas Drake.

"One receipt, however, given during this period, to wit, 30th April, 1883, was for coal royalty on the first lease, without reference to the other lease or to any supplementary agreement.

"21. There is no evidence, other than that of the receipts just mentioned, that the two leases were treated as one, or that the second one was merged in the first, or that the minimum royalty provided in the first lease was applicable to the coal mined under both leases; and the evidence is not sufficient to satisfy the master that the plaintiffs ever agreed or intended that the royalty paid should apply on both leases.

"22. Neither the defendants, Lacoe and Shiffer, nor the Glenwood Coal Company, who possessed and mined the coal under them, have delivered to Charles Drake, or to his heirs

or assigns, the full amount of fifty tons of coal per annum, as provided in the lease to the Massachusetts Coal Company, dated 13th April, 1865. Soon after the lease by Lacoe and Shiffer to the Glenwood Coal Company was executed, an order was drawn and delivered to Charles Drake, of which the following is a copy :

" ' Scranton, Jan. 20, 1872.

" ' Glenwood Coal Company please furnish Charles Drake, Esq., fifty tons of coal per year to commence October 1st, 1871, in satisfaction of provision of lease from said Drake to the Massachusetts Coal Company, on property now leased to you, and oblige and charge our account.          R. D. Lacoe,

" ' For Lessors to the Glenwood Coal Company.

" Endorsed : 'Accepted.   E. Phinney,

" ' General Agent.'

" Some coal was delivered under this order; but how much the evidence does not show; but the full amount was not delivered. It does not appear, however, that any complaint was made to defendants until the bringing of this suit."

The master then made a statement of coal mined and of the amounts owing for each six months from October, 1871, computing interest on each item to Oct. 1, 1891.

" Plaintiffs' 11th request for findings of fact is as follows :

" ' [That the plaintiffs are entitled to an account with the defendants for all coal mined from said upper vein, by the miners' ton, as established by the evidence at the time the contract was made.' Refused."] [5]

" The master's conclusions of law are as follows :

" [1. The plaintiffs are not entitled to a forfeiture of the lease of Charles Drake to the Massachusetts Coal Company, dated April 13, 1865, a copy of which is attached to their bill and marked 'Exhibit B.' Neither the nonpayment of royalty under the circumstances of this case, nor the nondelivery of the fifty tons of coal per annum entitles them to such forfeiture.] [8]

" 2. The construction contended for by the plaintiffs, that what was to be paid for under said lease, was a ton of uncleaned material, is inconsistent with the provision of said lease that the party of the second part should pay the party of the first part a ' royalty of ten cents per ton, miners' weight, on all merchantable coal.'

" [3. The plaintiffs are not entitled to an account for coal mined and removed from the upper vein. They have received an account, and the evidence as to the meaning of the term ' miners' weight,' does not show any error in such account.] [9]

" 4. The plaintiffs are not entitled to an account of the coal delivered and undelivered under the agreement to furnish them fifty tons of coal per annum.

" 5. The lease of April 13, 1865, to the Massachusetts Coal Company has not been merged in the prior lease of November 26, 1863, to the defendants, Lacoe and Shiffer, and the minimum royalty paid under the latter, is not applicable to any coal mined under the former.

" [6. The plaintiffs, Thomas Drake, Ebenezer Drake, George K. Drake and Lyman K. Drake, are entitled to a decree for the payment to them by the defendants, R. D. Lacoe and J. B. Shiffer, of the royalty on the coal mined from the upper vein, together with interest on the various installments thereof, from the semi-annual periods when such installments were payable.] [10]

" The master therefore recommends : That a decree be made by your Honors, directing the defendants, R. D. Lacoe and J. B. Shiffer, to pay to the plaintiffs, Thomas Drake, Ebenezer Drake, George K. Drake and Lyman K. Drake, the sum of five thousand three hundred and seventy-three dollars and forty-three cents ($5,373.43), together with interest from October 1, 1891, and also directing the said defendants, R. D. Lacoe and J. B. Shiffer, to pay the costs of this proceeding, and that as to John Jermyn, the other defendant, the bill be dismissed."

" Both parties have submitted conclusions of law, which they ask the master to find. . . .

" The plaintiffs' 2d conclusion of law is as follows :

" ' [The contract or lease of April, 1865, is forfeited for noncompliance with its terms.' *Answer :* This is denied. The master is satisfied that the terms of the lease have not been complied with. But it must be a very clear case in which a court of equity will enforce a forfeiture.] [6]

" In Oil Creek Railroad Co. v. Atlantic & Great Western Railroad Co., 57 Pa. 72, Mr. Justice SHARSWOOD says, that a court of equity never lends its assistance in the enforcement of a forfeiture. In Funk v. Haldeman, 53 Pa. 229 and 249, WOOD-

WARD, C. J., says, that equity does not ordinarily enforce forfeitures. And in other states it is held that a court of equity will not enforce a forfeiture : Warner v. Bennett, 31 Conn. 468 and 478 ; White v. Port Huron Railroad Co., 13 Mich. 356.

"Assuming that a court of equity may under certain circumstances enforce a forfeiture, it seems to the master that the right to have the same enforced in the present case has been lost by delay. In Thompson v. Christy, 138 Pa. 230 and 249, it is held that the right to declare a forfeiture must be promptly exercised.

"Furthermore, in the present case new rights have intervened since the right to a forfeiture accrued. The right to such forfeiture accrued in 1872. Whether the plaintiffs, then, or at any time during the mining, knew that coal was being taken from the upper vein under the second lease, does not appear, but it does appear that they knew of it in 1880. In 1887, more than six years afterward, the defendants, Lacoe and Shiffer, sublet the coal to John Jermyn, the other defendant, and Joseph J. Jermyn. The bill in the present case was not filed until 1888.

"In Evans' Appeal, 81 Pa. 278 and 302, it was held that where parties had full knowledge and where new business arrangements had been made, and other rights had intervened, and the parties had delayed to assert their rights, the delay was fatal. It is true that the case did not involve a forfeiture, but it seems to the master that the reasoning applies to the present case."

"The defendants' 8th conclusion of law is as follows : 'That the bill fails to aver or set forth any matter or thing relating to "miners' weight," or "miners' ton," and being, therefore, only a bill to recover a specific sum of money, it cannot be sustained.' *Answer :* The master cannot affirm this proposition. It is true that the bill fails to set forth anything relating to 'miners' weight,' except so far as it quotes the lease. It is also true that, under the view taken by the master, the plaintiffs' bill is practically a suit to recover a specific sum of money for which the plaintiffs have their remedy at law. Had this objection been taken to the bill on demurrer before it was amended it might have been sustained ; but the defendants having denied the material allegations in the plaintiffs' bill, and having had a full

hearing on the merits, and heavy expense and costs having been incurred, it seems to the master too late to sustain this objection now.

"In The Sunbury & Erie Railroad Co. v. Cooper, 33 Pa. 280, it was held that though a case be not a proper one for an application of an equitable form of remedy, yet if the court has jurisdiction of the cause of action, it may give redress in the equity form, if the defendant does not demur to the form, even though the common law form is the more proper one.

"In Adams' Appeal, 113 Pa. 449 and 455, it is said, 'This question should be determined, not by what may have been shown by the answer of testimony adduced in support thereof, but by what appears on the face of the bill itself. If the averments therein contained, assuming them to be true, present a case of which equity has either concurrent or exclusive jurisdiction, the bill should not have been dismissed, especially in view of the fact that the appellees did not object in limine by plea or otherwise to the jurisdiction of the court. While it is true that manifest want of jurisdiction may be taken advantage of at any stage of the cause, the court will not permit an objection to its jurisdiction to prevail in doubtful cases, after the parties have voluntarily proceeded to a hearing on the merits, but will administer suitable relief.'

"Apply these principles to the case in hand. The bill, as amended, sets forth that plaintiffs believe that the aggregate number of tons reported in the statements furnished them by the defendants, does not include all the coal mined from the upper vein, and that the number of tons mined has not been ascertained by the weight of the coal as it was brought from the mine in accordance with the terms of the lease, but in violation of said terms. Now, assuming these averments to be true, it cannot be said that there is manifest want of jurisdiction. The most that can be said is that it is a doubtful case.

"In Evans v. Goodwin, 132 Pa. 136 and 146, the court say : 'It is true the want of jurisdiction may be taken advantage of at any stage of the proceedings. But this is so only in clear cases when the want of jurisdiction is patent.' Is it not so here ? The most that can be claimed is that the want of jurisdiction is doubtful. Under such circumstances the defendants should have demurred. This was not done. The defendants

conceded the jurisdiction so far as it may be implied from his acquiescence in the reference to a master.   After such reference, involving heavy costs, the case should be very clear to justify us in setting the proceedings aside for want of jurisdiction.

" In Niles v. Williams, 24 Conn. 284, it is said that the decisions are uniform and establish the ruling that, on a bill in equity, an objection to the jurisdiction of the court cannot be taken at the hearing.

" And in Nicholson v. Pim, 5 Ohio State, 32, Chief Justice KENT is quoted as saying : ' Admitting the grounds in the first instance not to have been sufficient to have sustained the bill, the respondent comes too late to object to the jurisdiction of the court, after having put in an answer to the merits of the case.   By answering in chief, instead of demurring, he submitted his defence to the cognizance of the court.'   The ruling thus quoted, was followed by the Supreme Court of Ohio.

" In the present case the defendants have submitted to the jurisdiction of a court in equity, and have had a full hearing on the merits.   In the master's opinion they have failed to establish a complete defence.   A large mass of testimony has been taken, and heavy costs have been incurred.   While the evidence, as the master views it, does not entitle the plaintiffs to an account, because that has been already rendered, yet it seems clear to him that the plaintiffs are entitled to be paid for the coal mined from the upper vein.   It is just and equitable that they should be paid.   Therefore, as hereinafter stated, the master recommends a decree for such payment."

" Defendants' 12th conclusion of law is as follows :

" ' [That as matter of law the evidence as to the meaning of " miners' weight " or " ton " is such quantity of material uncleaned or clean as might from time to time in each colliery be agreed upon between the miner and operator as required to produce a ton of clean coal.'   *Answer :* This is matter of fact, and not of law, as the master views it.   The proposition is affirmed in the master's fourteenth finding of fact."] [4]

" Defendants' 16th conclusion of law is as follows :

" ' [That the plaintiffs, by reason of their laches, are estopped from maintaining this bill.   *Answer :* The plaintiffs by reason of their laches are estopped from claiming a forfeiture of the

second lease. They are not estopped, however, under all the circumstances, from demanding payment for the coal mined under said lease."] [7]

Exceptions among others were filed by plaintiffs to the master's findings of fact, conclusions of law, and answers to plaintiffs' and defendants' requests, as in brackets above. Defendants' 26th exception was to the master's 6th conclusion of law. Defendants' 24th exception, referred to in the opinion of the Court, was the refusal of a request to find that "under all the evidence in the case, plaintiffs' bill must be dismissed." Defendants' 31st exception was: "The master erred in not dismissing plaintiffs' bill as against all the defendants."

Plaintiffs' exceptions were dismissed, defendants' exceptions sustained, and a decree entered dismissing the bill, in an opinion by ARCHBALD, P. J.

*Errors assigned* were (1) dismissal of bill; (2–9) dismissal of plaintiffs' exceptions; and (10) sustaining defendants' 26th exception; quoting them.

*S. B. Price, James L. Morris* and *C. F. Bohan* with him, for appellants, cited: On the question of jurisdiction: Adams v. Beach, 1 Phila. 99; 1 Story's Eq. Jurisp. § 684; Willard's Eq. Jurisp. 135; Benson v. Baldwyn, 1 Atk. 598; Mitchell on Contracts for Sale of Land, 57; Kauffman's Ap., 55 Pa. 383; Sylvester v. Born, 132 Pa. 467; Daniell's Ch. Pl. & Pr. 653; Livingston v. Livingston, 4 Johns. Ch. 287; Underhill v. Van Cortlandt, 2 Johns. Ch. 339; White v. Carpenter, 2 Paige, 217; Bank Bellows Falls v. R. R., 28 Vt. 470; Niles v. Williams, 24 Conn. 279; Nicholson v. Pim, 5 Ohio, 25; Cooper v. Smith, 9 S. & R. 26; Montgomery v. Snodgrass, 2 Yeates, 231; Stewart v. N. W. Coal & I. Co., 147 Pa. 612; Ferguson's Ap., 117 Pa. 450; Washburn's Ap., 105 Pa. 480; Harper's Ap., 109 Pa. 9; Brush Electric Co.'s Ap., 114 Pa. 574; Bierbower's Ap., 107 Pa. 14; Earley's Ap., 121 Pa. 496; S. & E. R. R. v. Cooper, 33 Pa. 280; Adams's Ap., 113 Pa. 449; Evans v. Goodwin, 132 Pa. 136. As to defendants' liability for royalties: Davis v. Shoemaker, 1 Rawle, 135; Richards v. Bickley, 13 S. & R. 395; Wickersham v. Lee, 83 Pa. 424; Duff v. Bayard, 4 W. & S. 250; Berry v. McMullen. 17 S. & R. 84; Elkinton v. New-

man, 20 Pa. 283; Negley v. Morgan, 46 Pa. 285; Adams v. Beach, 1 Phila. 100; Kearny v. Post, 1 Sandf. 105; Royer v. Ake, 3 P. & W. 461. As to the meaning of the words " miners' weight:" 2 Parsons, Cont. 493; 1 Addison, Cont. 374; Williamson v. McClure, 37 Pa. 402; Allison's Ap., 77 Pa. 221; Brown v. Brooks, 25 Pa. 210; Carey v. Bright, 58 Pa. 70; Cooley's Const. Lim. 344; Reiser v. Sav. F. Assn., 39 Pa. 146; Harrison v. Mora, 8 Pa. C. C. R. 224; Evans v. Myers, 25 Pa. 114; Weaver v. Fegeley, 29 Pa. 27; Farmers' High School v. Potter, 43 Pa. 134; Godcharles & Co. v. Wigeman, 113 Pa. 431; Dunham v. Haggerty, 110 Pa. 560. On the question of forfeiture: McKnight v. Kreutz, 51 Pa. 232; Davis v. Moss, 38 Pa. 346; Hamilton v. Elliott, 5 S. & R. 375; Sheaffer v. Sheaffer, 37 Pa. 525; Becker v. Werner, 98 Pa. 555; Kenrick v. Smick, 7 W. & S. 41; Soper v. Guernsey, 71 Pa. 219; Bainbridge on Mines, p. 200, Dallas' 1st Am. ed.; Quinn v. McCarty, 81 Pa. 480; Taylor's L. & T. 379; Clark v. Cummings, 5 Barb. 339; Jackson v. Brownson, 7 Johns. 227; Gas Co. v. DeWitt, 30 Pa. 235; Wills v. Gas Co., 130 Pa. 222; Shimer v. Morris Can. etc. Co., 27 N. J. 364; Waterman, Spec. Per. of Con. 7.

*Everett Warren, E. N. Willard, Henry A. Knapp, Geo. S. Ferris* and *Frank W. Wheaton* with him, for appellees.—Even if the bill, as amended, presented grounds for equitable relief, plaintiffs were proven guilty of gross laches and have no standing in a court of equity: Herman on Estoppel, 733; Waterman, Spec. Per. of Cont. § 435; 2 Beach, Eq. Jurisp. §§ 843, 1021; 2 Pomeroy, Eq. Jurisp. pp. 136, 259; Neely's Ap., 85 Pa. 389.

There can be no claim for an accounting under the pleadings, the issues of fact, and the findings of the learned master, approved by the court below: Horton's Ap., 13 Pa. 66; Adam's Ap., 113 Pa. 449; Grubb's Ap., 90 Pa. 228; Harper's Ap., 109 Pa. 9; Mathers' Ap., 1 Cent. R. 342; Warner v. McMullin, 131 Pa. 370; Mitchell on Land Contracts, 65; Kauffman's Ap., 55 Pa. 383; Adams, Eq., 8th ed., p. 401; Bispham, Eq., 3d ed. § 485; Passyunk Building Association's Ap., 83 Pa. 441; Todd's Ap., 24 Pa. 429; Neely's Ap., 85 Pa. 387; Harrison v. Gibson, 23 Gratt. 212; Binney v. Brown, 116 Pa. 169; Irwin

v. Cooper, 92 Pa. 298; Hamilton v. Hamilton, 18 Pa. 21; Funk
v. Haldeman, 53 Pa. 244; Kingsley v. Hillside Coal & Iron
Co., 144 Pa. 617; Lazarus' Est., 145 Pa. 1; Borland's Ap., 66
Pa. 473; Bender v. George, 92 Pa. 36; Gas Co. v. Johnson,
123 Pa. 576; Lloyd v. Cozens, 2 Ash. 131; Bradford Oil Co.
v. Blair, 113 Pa. 83; Helme v. Life Ins. Co., 61 Pa. 107; Dun-
ham v. Haggerty, 10 Pa. 560.

Plaintiffs are not entitled to a decree of forfeiture: 2 Beach,
Eq. § 1010; 1 Pomeroy, Eq., §§ 451–9; Wills v. Manufacturers
Natural Gas Co., 130 Pa. 222; Morse v. O'Reilly, 4 Clark, 75;
McKnight v. Kreutz, 51 Pa. 233; Oil Creek R. R. v. R. R., 57
Pa. 65; Richard's Ap., 100 Pa. 52; Messimer's Ap., 92 Pa.
168; Thompson v. Christie, 138 Pa. 230; Mitford & Tyler's
Eq. Pleading, 204.

OPINION BY MR. JUSTICE DEAN, October 2, 1893:

The plaintiffs to No. 3, November Term, 1888, of the com-
mon pleas of Lackawanna county, filed this bill against defend-
ants, praying for an accounting as to certain coal royalties
payable to them under two certain sealed instruments executed
and delivered by their ancestor Charles Drake, dated respec-
tively the 28th of November, 1863, and the 13th of April, 1865.
The first dated agreement granted to Ralph D. Lacoe and J.
B. Shiffer the coal on a tract of land in Lackawanna county,
containing about 78 acres, excepting from its operation the
upper vein. The term of the lease was for ten years, and such
other and further time as the lessees should continue to pay
the royalty. The lessees agreed to pay a yearly minimum
rental of $500, semi-annually, on the first days of October and
April of each year, for which they were granted the privilege
of mining and carrying away five thousand tons of coal, "min-
ers' weight," at ten cents per ton, and agreed to pay the same
price per ton for all coal mined. The lease granted the usual
mining rights, with the right of constructing all shafts, tunnels,
slopes and air-shafts, and the using of all the surface deemed
necessary. It was agreed that the lease should be forfeited if
at any time an installment of rent should be unpaid for a period
of six months.

Subsequently, this agreement was assigned by Lacoe and
Shiffer to the Massachusetts Coal Company, and on the 13th

of April, 1865, Charles Drake leased to the same company the upper vein excepted in the lease to Lacoe and Shiffer, and by same contract granted the right to convey over or under said land, the coal contained in the same vein on a forty acre lot adjoining, known as the " Zeph. Knapp lot." The coal company agreed to pay semi-annually a rent or royalty of ten cents per ton, " miners' weight," and in addition to deliver to Drake, his heirs or assigns, free of cost, fifty tons of lump or prepared coal as he might elect, annually, during each year the lessee mined the coal of the lessor, or upon the forty acres adjoining, or in any way passed over or used the land to Drake. By its terms, this lease was made subject to the provisions of the lease between Charles Drake and Lacoe and Shiffer, as to its continuance, the payment of taxes and the inspection of books, as well as in the conduct of the mining operations, in a workmanlike manner. Both leases were afterwards assigned to R. D. Lacoe and J. B. Shiffer, who, with one Gaines, leased the coal in the seventy-eight acres to the Glenwood Coal Company, at an advance in royalty payable to themselves, and under different terms as to forfeiture and other provisions from those contained in the lease with Charles Drake. From 1872 to 1876, the Glenwood Company mined from the upper vein and reported the mining to Lacoe and Shiffer, and Lacoe and Shiffer sent a statement of the number of tons of prepared coal to Charles Drake or his devisees. Charles Drake died in 1873. His devisees, who are the plaintiffs in this suit, Thomas Drake, Ebenezer Drake, George K. Drake, have owned since his death and still own their interests in the land. Lyman K. Drake's interest was conveyed, and his interest in the accrued royalty assigned, to M. W. Morris and Isaac Everett.

Twenty-seven thousand eight hundred and sixty-eight tons, 12 cwt., of prepared coal were mined from 1872 to 1876, as reported in the statements. The Glenwood Company became insolvent, and Messrs. Lacoe and Shiffer repossessed themselves of the land and coal and again leased to John Jermyn and others.

The defendants paid the $500 minimum royalty semi-annually as required by the first lease. The plaintiffs, a short time before this suit, complained the returns were not by " miners' weight," but in tons of twenty-two hundred and forty pounds

of prepared coal only, and so made a demand for payment with interest for the coal mined, and demanded that it be mined and returned in "miners' weight," in accordance with the lease. The defendants refused, and the plaintiffs immediately afterwards filed the bill in this case, asking for an account, that the lease for the upper vein be declared forfeited for nonpayment of royalty, and that they have such other relief as to the court should seem meet.

The defendants, in their answer, do not deny the averments of plaintiffs' bill as to the execution of the lease to Lacoe and Shiffer and the Massachusetts Coal Company, nor any of the material facts set out, except that averring default in payment. They aver, however, that the leases had subsequently, by the construction put upon them by both parties, become merged ; that they were treated as one instrument, and the minimum royalty of $500 stipulated for in the first lease constituted their maximum liability as to annual payments under both leases ; that this sum had been paid by them and accepted by plaintiffs as in full of all demands.

They further averred, that they had accounted in tons "miners' weight" for all coal mined according to the reasonable interpretation of the lease, and denied plaintiffs' right to assert a forfeiture of the lease for the upper vein, because : 1. They had fully accounted. 2. If any such right could be asserted under the words of the grant, plaintiffs, by long delay, had waived their right.

The issue was referred to W. W. Lathrope, Esq., as master to take testimony, find facts and suggest decree. He had many hearings, took the testimony of more than forty witnesses, which, with much documentary evidence, is presented to us in more than 300 pages of the printed paper book.

The master finds as a fact, which is not disputed, that no coal was mined under the first lease, except about 700 tons. He also finds that the $500 minimum royalty provided for in that lease was annually paid in cash to plaintiffs. And further, from the years 1871 to 1876 inclusive, while the Glenwood Coal Company was in possession of the property, the 27,868 tons, 12 cwt., of coal were mined from the upper vein, the one granted to the Massachusetts Coal Company by the second lease of 13th of April, 1865.

If the number of tons, by a proper interpretation of the term "miners' weight," be correct, and the $500 minimum royalty to be paid annually on the first lease of the lower vein, can be transferred and applied in payment of this coal mined under the second agreement from the upper vein, then plaintiffs have substantially been paid in full; there is nothing left of serious contention between the parties.

As to the meaning of the term "miners' weight," much of the oral testimony was that of miners and mine operators; they testified as to their experience and observation, and gave in some cases their opinions; very often they were at variance. Without any testimony on the subject, we would not hesitate to say that the obvious meaning of the term was, such quantity of coal as was computed at a ton in paying the miner who mined by the ton. It did not mean a net ton of 2000 pounds or a gross ton of 2240 pounds, or the parties would have so said. The defendants made returns to plaintiffs of the number of tons of prepared merchantable coal, which they allege embraced the number of tons the miners were paid for digging; the miners mined and brought out in weight, much more, but after eliminating from the weight on the mine wagon all bone, slate, dust, and material that was not marketable as coal, there was left the number of tons reported to plaintiffs.

This is, in substance, the finding of fact by the master, who says: "13. Full statements of the coal thus mined were rendered by the defendants Lacoe and Shiffer to Charles Drake in his lifetime, and afterwards to the plaintiffs or some of them. No objection to their accuracy was made until shortly before the bringing of this suit. The objection then made was, while they showed the number of tons of prepared coal, they did not show the number of tons miners' weight, as called for by the lease.

"14. Under all the evidence, the phrase 'miners' weight' in 1863, and during the years when the said coal was mined by the Glenwood Coal Company, meant such quantity of coal, slate and dirt, as was agreed upon between the operators and the miners to be sufficient to make a ton of prepared coal."

We think this finding of the master correct. These returns of prepared coal were regularly made for years, and received by plaintiff without demand for the weight of material brought

out by the miners; there was no fraud nor any concealment.
By somewhat rude methods, about 20 per cent of the mine
wagon's contents was deducted as worthless; the remainder,
as coal, the miner was paid for; then the operator returned as
representing this, the number of tons of prepared coal marketed
by him. Plaintiffs knew this during all the years the returns
were being made, yet received them without objection. The
parties themselves, having thus interpreted the contract, it is
too late now to question its correctness. It is probable that if
this accounting had been called for when the accounts were
rendered, a detailed statement of the weight of material brought
out of the mine, and just what number of pounds of this mate-
rial was fixed as the miners' ton, would have been required of
defendants; not necessarily for the purpose of charging them
with something that was not marketable as coal, but, at least,
that the accuracy of the returns of prepared coal might be tested
by a comparison with the weight of the material in the mine
wagon.

As the finding of the master in this particular under the evi-
dence is correct, and has been approved by the court, the quan-
tity of coal mined from the upper vein must be taken as 27,868
tons, 12 cwt. Why should not defendants pay for it the price
agreed upon in the second lease?

They answer, the two leases, the one for the upper vein from
which the coal was mined, and that for the lower, from which
none of it was taken, were by the acts of the parties merged,
made one instrument, and the annual payment of $500 stipu-
lated for in the first, if appropriated in payment for this coal,
leaves nothing due on the second; that defendants, without
objection from plaintiffs, did in fact so apply it.

The evidence to establish the fact that the first and second
agreements were treated as one by the plaintiffs is far from con-
vincing. Some of the receipts for installments of the $500,
given after the death of the grantor, specify that the money
was paid on the first lease; one, dated April 9, 1875, mentions
that the payment was on lease of November 28, 1863, and "sup-
plement given to Massachusetts Coal Company." But with
the exception of this one receipt, all those given before Febru-
ary 18, 1880, used words which could only have reference to the
first lease to Lacoe and Shiffer. On this date, however, a sup-

plementary agreement was made between four of plaintiffs and Lacoe and Shiffer, which gave to them the right to transport other coal through this land as well as a license to deposit culm upon it.   In consideration, they agreed to pay to the Drakes $600 in cash and 50 tons of coal annually, the 50 tons to be in lieu of that agreed to be delivered under the lease to the Massachusetts Coal Company.   Then follows this clause : " 5.   Except as herein altered, amended and supplied, the said recited original leases and all and singular the provisions thereof, shall be and remain in full force and effect."   This is a distinct positive affirmation of the continued existence of the covenants in each of the first two agreements, except in the immaterial particulars wherein they were altered by the third.

The provision in the first lease for a payment of not less than $500 annually, and that of the second for the payment of ten cents " miners' weight " for each and every ton of coal mined, were not mentioned.   This last agreement is a supplement to the first two, because it grants or supplies rights and privileges omitted in them ; the second lease, while referring to the first for description, is in no sense a supplement, for it supplies nothing to the first and is between different parties.   All the receipts which adopt the words, " supplementary thereto," or words of like import, except the one of April 9, 1875, are dated after this third agreement, and the fair inference is, refer to it.   These facts, on which the master bases his finding, are not " narrow ground," as stated by the learned court ; they are established or undisputed facts in the conduct of the parties, irreconcilable with any other conclusion than that plaintiffs treated the first and second agreements as fixing on defendants the separate liability for the minimum $500, and also the royalty for the coal mined ; and the master was clearly right when he found, as a fact, that the evidence failed to show any agreement by plaintiffs, express or implied, that the $500 minimum in the first lease should be applied in payment of coal mined under the second.   This finding is also concurred in by the court, although not for the reasons given by the master.   We then have the fact established, that there is due and owing to plaintiffs from somebody, $5,364.75 for coal mined on the land described in the two leases ; the master is of opinion that defendants ought to pay this sum, and suggests a decree accordingly ; the court

is of a different opinion and dismisses the bill, because: 1. There was no privity in contract between the parties.  2. There was no privity in estate, consequently defendants were not accountable to these plaintiffs for the coal mined from their land.

It will be noticed, that, except a small part, all the coal mined was taken out of the upper vein, and was therefore mined under the second lease, that to the Massachusetts Coal Company of April 13, 1865.  This company, before taking this lease, had acquired by assignment from Lacoe and Shiffer the first one ; then, on November 16, 1869, they re-assigned both leases to Lacoe, in which re-assignment Shiffer and one O. F. Gaines acquired with him an apparent joint interest, for, on May 25, 1871, they lease the coal at an advanced royalty to the Glenwood Coal Company, which company mined the coal claimed for.  In this agreement Lacoe, Shiffer and Gaines covenant to perform punctually the stipulations with reference to payment of royalties to the Drakes under the first two leases ; they assumed, in this contract, to be the lessees under these first grants, and agreed with the Glenwood Coal Company that they would settle with and pay the Drakes as agreed upon in the first leases for the coal mined.  There was no pretence of claim to the coal except under the original leases, and a distinct positive acknowledgment of their liability to Drakes for all coal mined.  The Glenwood Coal Company proceeded to mine the coal in the upper vein, and took out nearly 28,000 tons ; they made returns of the coal as it was mined to Lacoe and Shiffer, who made returns to Drakes.  They had acquired the leases, after the dissolution of the Massachusetts Coal Company, and thereafter both parties, Drakes and Lacoe and Shiffer, by the most significant acts and declarations kept up through many years, treated each other as if lessors and lessees under the original agreements.  However comprehensive may have been the assignment to the Glenwood Coal Company, who mined the coal, Drakes were no party to it, and Lacoe and Shiffer made careful provision in the assignment they should not be.  The written papers, the conduct of the parties, all show beyond controversy an intention to treat the Glenwood Coal Company, who, by the agreement of 25th of May, 1871, acquired the right to mine, as the mere agents or under lessees of Lacoe and Shiffer, with no interruption to Lacoe's and Shiffer's constructive possession un-

der the assignment to them of the original leases.  It is a waste of time to discuss the question, whether, technically, the privity of estate between the Drakes and Lacoe and Shiffer was, in law, severed by the contract of 25th May, 1871, with the Glenwood Coal Company ; certainly, the relation between the defendants and plaintiffs, created by the first two leases and the assignment, never, in their understanding of it, ceased to exist; neither of the parties intended it should be interrupted; if defendants had been answerable, had they themselves mined the coal, their liability, so far as concerns these plaintiffs, under this evidence, was not changed by their assignment to the Glenwood Coal Company.

Nor anywhere, in all this prolonged litigation, down to the announcement of such defence in the opinion of the learned court below on exceptions to the master's report, while they allege they paid for it, do they intimate a denial of their accountability under the contract, for all the coal mined ; on the contrary, they aver, and attempt to prove, the measure of their accountability arises from a privity of estate constituted by the two instruments treated as one, and not from the separate stipulations of each.

The 5th paragraph of plaintiffs' bill avers that Lacoe and Shiffer, during the years 1872, 1874, 1875 and 1876, mined from the upper vein 27,868 tons, 12 cwt., of coal, which they have not paid for.

This averment is thus answered by Lacoe and Shiffer : " 5. They (defendants) admit that during the years 1872, 1874, 1875, and 1876 there were mined from the upper vein from said property 27,868 tons, 12 cwt., of coal, but they deny they have neglected or refused to pay or cause to be paid the money due and owing therefor."  Then they go on to state, they paid for it by applying the minimum royalty of $500 under the first lease in discharge of the covenant to pay 10 cents per ton for coal mined from the upper vein under the second.

The whole contention of fact before the master turned on the two questions : 1. Had the defendants made correct returns under the contract ?   2. Had the parties united the two leases and agreed the money paid under the one should discharge the liability for coal mined under the other?

Mr. Lacoe, in his testimony, says, in narrating a conversa-

tion with Drakes concerning the quantity being mined by the Glenwood Coal Company, " it was talked of as a matter of interest'to both of us, they as our landlords, and we as the landlords of the parties that were mining."

The master makes a most careful and elaborate report on the law and the facts ; passes fully on every question raised. The defendants made request specifically, for fourteen findings of fact and seventeen of law ; in not one do they ask that plaintiffs shall be turned out of court because the privity of estate between them had ended before the coal was mined. Nor do the exceptions before the court distinctly raise the point on which the bill was dismissed. The 24th, 26th, and 31st exceptions to the master's report are sustained ; they are general exceptions, and manifestly, from their connections, the other findings, and the issues raised, are intended to assert defendants were not bound to account because they had already accounted ;. were not bound to pay for they had already paid. It is not conducive to the ends of justice to use a general exception so as to include a question of blended fact and law not raised before the master ; both the learned court below and we have a right to the master's finding of fact and conclusions of law after full hearing. The court has found, because defendants had made the contract of 25th May, 1871, and were not parties to the second lease with Charles Drake, plaintiffs' ancestor, therefore there was no privity in estate that would warrant a decree for money which both the master and court have found was owing to plaintiffs.

That the absolute assignment of the term, and the acceptance of the assignee as tenant by the lessor, discharges the assignor from all obligations arising from privity of estate, is not questioned ; and this is so, because such is the intention of the parties, either expressed, or implied from written instruments and conduct which reasonably admit of no other interpretation. But an assignment for an increased consideration, with wholly new stipulations, with right of re-entry for conditions broken, with an express assumption of continuing liability of the assignors to the owners under the original lease, and a manifest intention to sublet, not only is not evidence of intention to end the privity of estate, but is a positive re-affirmance of it.

But, aside from this, if even the evidence warranted the con-

clusion that the privity of estate had ended, the point was made too late. If not raised by demurrer, it should at least have been embodied in the answer. To join issue with plaintiffs on their averments, proceed to long and costly litigation, and then, when the questions forming the subject of contention have been decided against them, to raise an entirely new one in oral argument before the court, for it is not found in the record, such new question should either not have been noticed, or it should have been referred to the master for further hearing and a supplementary report on the law and facts. In effect, the master's conclusions assume, and correctly too, there was a privity of estate between plaintiffs and defendants, and that is the foundation for the decree suggested by him. He rightly concludes that because of plaintiffs' long delay in asserting a right to forfeit the lease for nonpayment, equity will not decree a forfeiture : Oil Creek R. R. Co. v. Great Western R. R. Co., 57 Pa. 72; Funk v. Haldeman, 53 Pa. 249; Thompson v. Christy, 138 Pa. 249.

The defendants' 8th request, to find as a conclusion of law that this, being only a bill to recover a specific sum of money, therefore the remedy is at law and not in equity, was denied. After the evidence was heard, it was found that plaintiffs, by long acquiescence in the returns made of the weights, had precluded themselves from demanding any further or other accounting, or from giving any other interpretation to the term "miners' weight" than that indicated by the returns; so, in fact, it was only determined, after hearing, that the sum due them could have been recovered at law without an accounting; but this does not oust jurisdiction in equity. As is said in Adams's Appeal, 113 Pa. 449 : " This question should be determined, not by what may have been shown by the answer and testimony adduced in support thereof, but by what appears on the face of the bill itself. If the averments therein contained, assuming them to be true, present a case of which equity has either concurrent or exclusive jurisdiction, the bill should not have been dismissed, especially in view of the fact that the appellees did not object in limine by plea or otherwise to the jurisdiction of the court. While it is true that manifest want of jurisdiction may be taken advantage of at any stage of the cause, the court will not permit an objection to its jurisdiction

to prevail in doubtful cases after the parties have voluntarily proceeded to a hearing on the merits, but will administer suitable relief."

Here, from the averments in plaintiffs' bill and the copies. of contracts, it appeared as if a final decree could be had only after the investigation of complicated accounts running through many years. It turned out from the evidence that returns had been made and received without objection during the years for which the accounts were asked, and several years elapsed before any other accounting was asked for. Even if the accounting was not such as stipulated for in the contracts, it was practically impossible then for defendants to make any other ; therefore, equity demanded that plaintiffs should be content with what they had so long neglected to object to. The sum of tons in the accounts thus rendered, multiplied by ten cents, would have constituted plaintiffs' claim for which an action at law would have been an adequate remedy. But the evidence and not the pleadings demonstrated this. Besides, the defendants practically conceded the jurisdiction by failing to demur. After full hearing, involving heavy costs, a doubt as to equitable jurisdiction is not sufficient to oust it. The master so decided, and in so doing he is fully sustained by the authorities. The decree suggested by him accomplishes the substantial justice in the cause ; that of the court falls quite short of it, because it is not in accord with the evidence.

Therefore, appellants' first assignment to the decree of the court dismissing the bill is sustained, and that decree is reversed ; it is further ordered that the bill be reinstated, and it is now ordered and decreed that defendants, R. D. Lacoe and J. B. Shiffer, pay to the plaintiffs the sum of five thousand three hundred and seventy-three dollars and forty-three cents ($5,373.43), with interest from October 1, 1891 ; as to John Jermyn, the bill is dismissed. It is further ordered that said R. D. Lacoe and J. B. Shiffer pay the costs both of proceedings in court below and on this appeal.