# Drake et al., Executors, *v.* Berry, Trustee, et al.

*Mines and mining—Coal leases — Accounting — Construction—Forfeiture.*

1. "Miners' weight" as used in a coal lease is not a fixed, unvarying quantity of mine run material, but is such quantity of the same as operators and miners may from time to time agree as being necessary or sufficient to produce a ton of prepared coal.

2. Where a coal lease provided "miners' weight to be the standard" of each ton of coal mined, and thereafter the successors in title of the lessors brought a bill in equity against the lessees for an accounting for coal mined, the court properly decided that the accounting should be on the basis of the miners' weight fixed upon by the operators and miners during the accounting period, not

upon the basis of the miners' weight as it existed at the time of the execution of the lease.

Drake et al. v. Lacoe et al., 157 Pa. 17, followed.

3. In such case, a provision in the lease "that sufficient pillars of coal shall be left to support the roof over the gangways and the usual protection of the mines generally," was for the protection of the colliery, not of the surface, and the successors of the lessors, though owning the surface, were not entitled to an injunction to restrain the removal of coal from the pillars, especially after all reason to apprehend surface disturbance by the removal of such coal had ceased to exist.

4. In such case a usage that the owner of the surface was entitled to one-third of all the pillar coal, could not be set up to defeat a grant of all the coal in the mine, and the successor of the lessor was not entitled to restrain the removal of such coal or to have a forfeiture of the lease declared because of such removal.

Argued April 12, 1917. Appeals, Nos. 25 and 50, Jan. T., 1917, by plaintiffs and defendants, from decree of C. P. Lackawanna Co., May T., 1912, No. 3, in equity, on bill in equity for an accounting, in case of George Drake, Executor, Sarah E. Drake and Caroline E. Stewart, Executrices of the Last Will and Testament of George K. Drake, dec'd., v. John W. Berry, Trustee, R. D. Lacoe and Margaret Lacoe White, Heirs and Administrators of the Estate of R. D. Lacoe, Deceased, and Frank S. Shiffer, Surviving Executor of the Last Will and Testament, and William A. Shiffer, Frank E. Shiffer, and Gertrude Healey, Heirs of J. B. Shiffer, Deceased, Joseph J. Jermyn, Surviving Partner of John Jermyn and Joseph J. J. Jermyn, Copartners Trading as Jermyn & Co., James L. Morris and E. W. Mulligan, Executors of the Last Will and Testament of M. W. Morris, Deceased, Huldah A. Drake, Ebenezer Drake and Thos. Drake. Before BROWN, C. J., MESTREZAT, POTTER, FRAZER and WALLING, JJ. Affirmed.

Bill in equity for an accounting.

The principal relief asked for in the bill was for an accounting for coal royalties payable to plaintiffs under

two coal leases, executed in 1863 and 1865. The main question was the tonnage basis upon which the royalties are to be paid. In addition to the prayer for an accounting, a decree was asked for declaring the leases to be forfeited and for an injunction restraining the defendants from mining and taking coal away from the leased premises. The trial judge, NEWCOMB, J., found as follows:

### CONCLUSIONS OF FACT.

1. The bill was filed April 6, 1912, by George K. Drake, now deceased, who sued in his rights as successor in title upon the death of his father, Charles Drake, called the lessor in the instruments hereinafter mentioned. He had succeeded, however, as one of four brothers who became equal tenants in common. His cotenants, not joining in the bill, are for technical reasons made parties defendant. After the death of the original plaintiff substitution was made as appears by the above caption.

The firm of Jermyn & Company, by its surviving partner, is a sublessee. The other defendants represent the interest of the lessees next hereinafter mentioned.

2. The subject-matter is the amount of royalty bearing coal mined from several veins underlying a tract of seventy odd acres of land in what is now Old Forge Township, this county, of which Drake, the lessor, was owner in fee. In 1863 and 1865, respectively, he made two indentures under seal, commonly called "Coal Leases." The one granted to R. D. Lacoe and J. B. Shiffer—both now dead—their heirs, assigns, etc., all the coal in the tract, excepting the upper or Marcy vein; the other granted to the Massachusetts Coal Company, its successors and assigns, all the coal so excepted. The first was for a term of ten years and such further time as lessees should continue to pay the royalty, subject to forfeiture for default of payment for the period of six months. A yearly minimum of $500 was to be paid in half yearly installments on the 1st of April and October, collectible

at lessor's option by distraint.  In consideration thereof lessees were to have the right to mine and carry away 5,000 tons of coal yearly at ten cents a ton "miners' weight to be the standard."  The same price was to be paid for all coal mined in excess of the minimum which was to be paid whether mined or not, subject, in case of deficit in mining or payment in any one year, to have credit for any excess thereof in any preceding year, with the privilege of making up in any subsequent year such deficit of coal as may have been paid for though not mined in any preceding year.  The lease conferred the usual mining rights for purpose of shafts and other structures, with the use of so much surface as might be deemed necessary or expedient, inter alia, for roads and wasting grounds.  There was a covenant for workmanlike mining and that "sufficient pillars of coal shall be left to support the roof over the gangways and the usual protection of the mines generally."

3. While the second lease passed all the coal in the Marcy, the obligation to mine was limited to the "merchantable coal," the exhaustion of which was the only thing to define the term.  There was no minimum but the royalty was ten cents a ton "miners' weight on all the merchantable coal mined from said vein," etc., payable semiannually.  Lessee was to have the right of way over or under the demised premises after the expiration of the term for the conveyance of coal taken from the corresponding vein on an adjoining tract.  It was further stipulated that the lease was "subject to the provision of" the Lacoe and Shiffer lease "so far as relates to its continuance, the payment of taxes and the inspection of books as well as the conduct of mining operations in a workmanlike manner."  In addition to the royalty, it called for the annual delivery to Drake or his successors of "fifty tons of lump or prepared coal" so long as lessee's rights in the premises should continue to be exercised. The lease changed hands and eventually became vested in Lacoe and Shiffer, who thus acquired the leasehold in

both parcels of coal. They died, seized of that estate in both, and it is now in their personal representatives. But during all the time for which accounting is asked, the mining has been done by Jermyn & Company under their sublease of April 1, 1887, copy of which is set forth as Exhibit One in their separate answer. The fact is noted that parties to this instrument defined as "merchantable coal" everything above the size known as pea, but stipulated for a given royalty on all sizes including pea as well as still smaller sizes. The books and accounts of production in evidence are those of Jermyn & Company.

4. The lessor died in 1873 and was succeeded in title by his four sons. One of these was George K., original plaintiff here. Another was Lyman K., who sold and transferred his share to Mr. Lacoe, one of the lessees. In that state of the title the parties in interest, by writing 18th February, 1880, modified the provisions of the leases so as to subject the tract, both surface and subsurface, to certain uses for the benefit of mining operations on an adjoining tract so long as might be needed, regardless of the expiration of the terms of the leaseholds unless ended by forfeiture. The only other modification had to do with furnishing the fifty tons of coal. This was changed by apportioning the amount equally between the parties entitled, specifying the place where delivery was to be made on demand, and providing that the right to demand it should be exercised each year. For the contents of these several writings reference is made to copies exhibited in the bill as A, B and C, respectively.

5. Up to that time no mining of consequence had been done under the earlier lease, though the minimum royalty had been regularly paid. Later there was an unsuccessful attempt by lessees to apply these payments on account of the mining which had been done in the Marcy vein under the second lease. This brought on a bill for accounting in 1888. The operations for which accounting is now demanded go back to 1891 in the Marcy, and

to 1899 in the lower veins governed by the earlier lease. Back of 1891 there had been no mining except in the Marcy and it is drawn in question only incidentally in connection with defendant's claim that the royalty unit is res adjudicata by force and effect of the decree of October 2, 1893, in the former suit.   See Drake v. Lacoe et al., 157 Pa. 17.

6. The meaning of the "miners' weight" as used in the lease of 1863 is the key to the question in dispute.   If, as contended by defendants, it is the equivalent of a ton of "prepared sizes" of coal ready for shipment to market, then admittedly there was nothing to account for on that score when suit was brought, as payment had been either made or tendered in full of all that defendants were bound to pay by the terms of the contract.   Indeed, in that case they have overpaid.   The term "prepared sizes" or "prepared coal" includes nothing below chestnut; so it is not disputed that if the language of this lease was effective to limit the royalty to prepared sizes of coal, the pea, buckwheat and other so-called steam sizes would go free.   On the other hand it is equally undisputed that in case of the Marcy the lessees paid on all sizes without question until a comparatively recent date.   They now deny liability for anything below chestnut plus an allowance for loss in tonnage of prepared sizes due to breaking the coal down in order to supply the market demand of later years for chestnut and smaller sizes.   To cover their estimate of the value of plaintiff's equity arising in that way they now include in their tender the royalty on 52 21/100 per cent. of the pea which goes to market, and claim entire exemption only for sizes below that.

7. This view seems to have originated since 1900, or soon after active operations began under the 1863 lease. It is candidly admitted by Mr. Berry to have been due to the outcome of the "Warrior Run Case," i. e. Wright v. Coal Co., 182 Pa. 514, which was decided in 1897.   It could hardly have been entertained before 1900, as a payment relied upon to settle a large part of the claim for mining

in the Marcy was made October 25th, that year. This is evidenced by a voucher made out by defendants covering in detail the total yield from 1891 to April, 1897, when the operation in this vein was discontinued in the belief that it was exhausted. Thus they paid on the marketable product at that time. While the same is true of the earlier payment to satisfy the decree in Drake v. Lacoe et al., supra, covering the antecedent mining in that vein, it is also true that it included nothing below chestnut as that was the smallest size going to market during the period involved in that accounting, which was from 1871 to 1876. Hence, there was no specific occasion to claim immunity as regards smaller marketable sizes in that instance. But not so in respect to the payment of 1900 for the operations between 1891 and 1897, as at that time it is not disputed that both pea and buckwheat were marketed, and that both were voluntarily accounted for in that settlement.

8. The voucher of 1900 appears by copy as defendant's Exhibit A in the separate answer on part of lessees, and also as their Exhibit No. 1 in the proofs, to which reference is made for its contents. The fact is here noted that plaintiffs seek to avoid its prima facie effect on the allegation that it was executed and delivered by their testator on the faith of an oral understanding that it didn't mean what it says, but only a payment on account which could be accepted without prejudice. It is also noted that the parties have at all times treated the half yearly payments under the lease for this vein as falling due the first of April and October as in case of the earlier lease.

9. Later, more coal being found in the Marcy, mining was resumed there in 1910 in connection with that being carried on in the lower veins. Before the end of March, 1914, the new operation was complete and the vein finally abandoned. No separate account of the shipments from this source was kept during that period and the marketable tonnage can only be calculated from the

quantity which came to the breaker in the mine cars, as to which a record was kept of the total number. But this involves some dispute as to the average weight of the car content. Plaintiffs say it was 7,099, and defendants 5,732 pounds.

10. By mutual consent of the parties Mr. George E. Stevenson, a competent engineer, was designated by the court to make an independent test of the weights. Upon what is believed to have been a fair and adequate test he makes the average 6,641 pounds per car. That is somewhere near midway between the opposing figures of the parties and is the figure adopted in view of the conclusion founded upon the testimony of Mr. Corcoran, general manager of the Jermyn & Company operation since its inception, that the weights have at all times been substantially uniform. The number of cars from this vein during the years in question was 33,270, making a gross tonnage of 99,229.08 going into the breaker. There is no reason to believe there was any falling off in percentage of yield as compared with that of 1896-7, the last year for which a separate account had been kept, when it was 71 9/10 (71 9/10%) ; and that is adopted as the percentage applicable to the years 1909 to 1914. This would make a marketable tonnage of 70,719.75 tons for that period; and the fact is accordingly so found. If the royalty is payable on that basis it would amount to $7,-091.98, of which plaintiffs' share would be $1,773. The yearly production appears by computation shown in blueprint hereto attached and marked B, to which reference is made for the half yearly amounts with interest thereon to October 1, 1915, of $423.30, a total of $2,-196.30.

11. This calculation takes into account neither the fuel coal used by the operator, nor plaintiffs' claim for pillar coal based on the contention that under the terms of the contract in the light of an alleged usage of the industry at an early day, the lessor was entitled to have approximately one-third of the coal left in place as pil-

lars for support of the surface; and, none being so left, to that extent the mining was wrongful. Hence, the claim that pro tanto defendants should account for the value of the coal in place. While the quantity from that source may be susceptible of calculation from certain data in evidence, for reasons hereinafter stated it has not been calculated.

(Lower veins—1863 lease.)

12. In the veins below the Marcy the mining began in the fall of 1899 and is still in progress. The minimum was accepted regularly until March 31, 1905, inclusive. From that time ever since it has been refused because of the dispute culminating in the present suit. No report of the tonnage was made until 1911, apparently because it was then for the first time formally demanded. The omission to report on the one side, and to make demand on the other, had been due to the fact that the minimum for years gone by had amounted to enough to cover the mining for some years after actual operations began. On defendant's theory the advance minimum became exhausted on March 31, 1913. There having been no tonnage to account for before 1900 as in case of the Marcy, there has been no period of the mining under this lease when the parties settled with each other on the basis of the marketable tonnage. But in addition to the minimum falling due since April 1, 1905, defendants have tendered a further sum to cover plaintiffs' share of the excess payable on their present theory of liability for prepared sizes and a percentage of the pea.

13. According to the usage prevailing in this region in 1863 the term "miners' weight" meant the gross ton plus 10%, or 2,464 pounds in the mine car. It was afterwards increased so that while it varied somewhat as between different sections of this valley, at Old Forge and vicinity since the early '70s it has been 3,024 pounds. In either case it was the weight of mine-run material that the miner must produce in order to get paid for mining a ton of coal, the excess being a more or less arbitrary al-

lowance against him for refuse and waste in the mine car content.

Defendants claim that instead of a fixed quantity, the term was defined in Drake v. Shiffer, supra, to mean such amount of material in the mine car as should from time to time be agreed upon, not by the parties but, by and between operator and miner as sufficient to yield a ton of prepared coal after passing through the breaker; and as such would be an indefinite and variable quantity depending upon the character of the vein material for the time being, so that by a sort of circumlocution it amounted to an agreement for ten cents a ton on "prepared sizes" only. If that be so, they are in no default for the reason already stated.

It may be added that for the purpose of keeping their tender good it was maintained at bar by paying into court for plaintiffs' use the sum of $5,725.29 sec. reg.

14. Plaintiffs demand an accounting at ten cents a ton of 2,464 pounds in the mine car before the coal went into the breaker. This quantity can now be determined only by the same method of calculation mentioned in case of the Marcy. (See 9th conclusion above.) The number of cars appears by the operator's books. At the same average weight the total to October 1, 1915, would be 549,047 mine tons if the ton be taken at 2,464 pounds. At 3,024 pounds for that factor it would be 447,385 tons.

This date is adopted as limiting the period to be accounted for because it was the latest date to which the calculation could be carried at the time when the issue went to trial.

15. It follows that on this basis one-fourth of the royalty to that date would be either $13,726.18 or $11,184.63 according as the lower or higher unit should be taken as the "miners' weight." In either case the figure would be subject to a credit of $5,125 by reason of the minimum payments accepted by plaintiffs or their testator. In the one case the royalty would be covered down to April 1, 1906, and in the other to October 1, 1907. One of these

would therefore become the interest date if lessees are accountable on either basis. The result is that in the one case the royalties with accrued interest would amount to $10,639.97; and on the other to $7,227.54 on October 1, 1915, as shown by detailed computation in blueprints hereto attached, marked respectively A1 and A2.

16. Associated with the question of pillar coal, mentioned in the eleventh Conclusion, is that of damages for surface subsidence occasioned by mining out the pillars. None were left in either the Marcy or the Clark vein next below, in both of which the mining has been completed. Defendants intend to mine the lower veins to the same extent, but no further injury is apprehended from that source. That there has been some disturbance of the surface is not denied, and lessees admit their liability on that score as well as the jurisdiction of equity to take account of the damages in this proceeding. The dispute is as to the nature and extent of the injury and its amount in dollars and cents, as to which the difference is marked. Title to something like forty-five acres of surface remains in lessors' estate. It is believed, and accordingly found, that the subsidence is now complete and that it affects not to exceed three acres of which the value before the injury was not more than $900; and that the depreciation by reason of the injury does not exceed $500. The legal injury was complete upwards of three years ago.

The requests for specific findings of fact not substantially covered by the foregoing are disposed of as follows:

PLAINTIFFS' REQUESTS.

13. Payments of minimum royalty on the lease of November 28, 1863, were accepted from 1891 to 1905, but notice was given that miners' weight was the standard, that is, 2,464 pounds per ton, and payment demanded at ten cents per ton.

Answer: It is so found.

14. The receipt offered in evidence by the defendants, of October 25, 1900, signed by George K. Drake, was signed by him upon the representation that it would not be used against him in any lawsuit, but the money would be a payment on account. It was for coal mined from the Marcy vein under the lease of 1865.

Answer: It is not so found, except that it is true the coal referred to was mined from the Marcy vein under the 1865 lease.

15. Statements of the total coal shipped and sold taken from the Marcy vein were rendered to the plaintiffs from 1891 to 1897. The coal was paid for and receipt given October 25, 1900, on oral condition that it was on account and that it was not to be used in any suit.

Answer: It is so found, except as to the alleged "oral condition" which is not so found.

### DEFENDANTS' REQUESTS.

4. When the leases involved in this suit were made, the only coal that was merchantable or marketable was what was known then, and is known now, as the prepared sizes, consisting then of part of the chestnut coal and the sizes larger, and consisting now of all of the chestnut coal and the sizes larger.

Answer: It is so found.

6. At the time the leases involved in the present action were made the phrase "miners' weight" meant such quantity of coal, slate and dirt as was agreed upon between the operators and the miners to be sufficient to make a ton of prepared coal, that is to say, such a quantity of the run-of-mine material, including dirt, slate and rock, as should from time to time be agreed upon between operator and miner to be necessary to produce a ton of prepared coal.

Answer: It is not so found.    For further answer see the thirteenth general conclusion supra.

Requests, 7, 8, 11 and 12, ask for conclusions of law and for that reason are declined in this connection.

The facts are believed to warrant the following

### CONCLUSIONS OF LAW:

1. By the terms of the lease of 1863 lessees and their successors in title became accountable at the stipulated royalty on the same tonnage for which the miners were for the time being paid.    During the period now in question the unit for that purpose was the so-called miner's ton of 3,024 pounds of the vein material just as it came from the mine and before going into the breaker.

2. Whether the same was true of the 1865 lease need not now be decided because the parties and their predecessors had for many years voluntarily dealt with each other on another basis not inconsistent with the express terms of the contract, to wit: that of the merchantable yield.    That should now be regarded as the established rule to be applied to the mining in the Marcy vein.

3. Therefore in case of the first lease, lessees should account at ten cents per ton of 3,024 pounds on the gross amount of the mine car contents going into the breaker; and in case of the other lease at the same price for the tonnage of all sizes which went to market. ˙

4. It follows that the amount tendered was not enough to cover the claim; and taking the account down to October 1, 1915, with the accrued interest, lessees were then owing for royalties under the first lease the sum of $7,227.54, and under the other $2,196.30, as shown in detail by the blueprints hereto attached marked respectively A2 and B.

5. For plaintiff's share of the damages to the surface, defendants should account and pay the sum of $125, with damages for detention equal to interest at six per cent. annually since the inquiry was complete, a total of $147.50.

6. The evidence is insufficient to warrant either injunction to restrain the mining or forfeiture of the contracts.

7. A decree should be entered against the defendants representing the estates of Lacoe and Shiffer directing them to pay to the plaintiffs the sum of $9,571.34, with interest from October 1, 1915.

8. The same defendants should pay the costs.

The requests for legal conclusions not covered by the foregoing are disposed of as follows:

### PLAINTIFFS' REQUESTS.

2. The defendants were obliged, under the custom of mining and the contract between the parties, to leave sufficient coal for the support of the surface. Had this been done, the surface would not have been injured, and the coal so left would have been the plaintiffs'.

Answer. Refused. There was no covenant to support the surface; and none was needed. While lessees took title to all the coal, together with the right to mine and remove it, they could only exercise their right subject to liability for damages in case of injury to the surface. There was a sale of the coal with adequate mining rights without any waiver of damages for surface injury.

3. The plaintiffs should be paid for the coal taken which was necessary to support the surface, at fifty cents a ton, its value in place.

Answer. Refused.

6. Plaintiffs, George Drake and his executors, are entitled to have delivered to him and them twelve and one-half tons of coal annually from 1865 to the present, or to be paid therefor.

Answer. Refused. The proofs fail to show any breach by lessees of their covenant to deliver coal on demand as provided in the writing of 1880.

7. The proviso of the lease from Lacoe and Shiffer to Jermyn & Company recognizes the right of support of

surface, and should have been enforced between the contracting parties, and must now be enforced by decree of this court.

Answer. Refused.

### DEFENDANTS' REQUESTS.

1. Where the demise is of all the coal, together with the right to mine and remove the same, the lessee is entitled to take all the coal for a price to be ascertained in the stipulated mode, which, in the present case, was the payment of ten cents per ton on prepared sizes only.

Answer. As to the extent of lessees' right the request is affirmed; but as to the stipulation for royalty on prepared sizes only, it is refused.

If specific answers be desired in case of the omitted requests, or any of them, they will be supplied on exceptions.

### DISCUSSION.

I find myself unable to agree with the learned counsel for lessees that their liability is limited to prepared sizes of coal, and was so determined in Drake et al. v. Lacoe and Shiffer, 157 Pa. 17. That decree had to do with the Marcy vein only. The parties were held to their own practical interpretation of the lease, and the plaintiffs to the consequences of estoppel. The result was that lessees were required to pay as they had accounted, viz: for the tonnage which went to market. That was consistent not only with the mutual conduct of the parties in their respective treatment of the accounts rendered during the progress of that period of mining, but also with the terms of the contract itself which differ from those in the 1863 lease in that they impose the obligation to pay upon "all the merchantable coal mined from said vein." The mere fact that at the period then in question nothing below the prepared sizes had been marketable, cannot be regarded as limiting the obligation in every

event; and heretofore it was not so regarded by lessees. In 1876 the mining had been interrupted. It was resumed in 1891 and the second period ran from that date to 1897. In the meantime two things had happened: (1), Drake v. Lacoe had been decided; and (2), a market demand for small sizes had arisen—an event of which lessees were getting the benefit: See lease and accounts of Jermyn & Company. While lessees did not settle for the royalties accruing during this period until 1900, they had regularly accounted, as they eventually paid, for everything that went to market. The voucher . for that settlement doesn't show the proportions of each size, but the fact is freely admitted that it included the small sizes. Evidently the delay in payment was due to a dispute between the parties, but it involved no question by lessees that they were liable to that extent, as that was the royalty basis for which they were then contending. Thus both parties are now trying though on wholly different grounds to break the force and the implied effect of that settlement. It conformed to the method of accounting that had been approved in the earlier case because it was held to be too late for plaintiffs to then call it in question. That reasoning must be deemed to apply with at least equal force at this late day; and to both parties alike. Plaintiffs' attempt to avoid the terms of their testator's receipt by parol cannot be seriously entertained. There is no pretense of fraud or deceit as to its contents. On the contrary, the very nature of the parol evidence necessarily assumes that he executed the writing with full knowledge not only of its contents, but of its prima facie legal effect. In his lifetime he never repudiated it, and he survived many years. In the face of positive contradiction on the other side it cannot now be cancelled for the benefit of his successors on the allegation that it was signed with the understanding that its effect should be something other than what he knew it purported to be. Needless to say, if that can

be done, it becomes an idle formality to put any human transaction in writing.

The reciprocal rights and liabilities under the 1863 lease are unaffected by any course of mutual dealing giving rise to a question of practical construction by the parties. So far as drawn in controversy in the former proceeding it was there ruled adversely to lessees that this contract had not become merged with the later one then in suit; and the present case involves no such claim. One is at a loss, therefore, to see upon what theory it is now contended that lessees have accounted according to the royalty basis defined in that case: See their separate answer, par. 4 and 5. In my judgment their theory derives no support from Coal Co. v. C. & I. Co., 225 Pa. 211, and kindred cases founded on a stipulation for royalty on definite sizes. In such instances the parties necessarily have in contemplation the marketable yield as the royalty basis.

It will be observed that nothing is said in this lease about "merchantable" coal. What is granted is "all the coal in, under and upon," etc. What it binds lessees to pay is ten cents a ton "for all coal mined and removed from the premises." If nothing more had been said a different question might arise as to the royalty bearing coal. But the parties to the contract saw fit to adopt a standard and to define it as the ton for which the miner should be paid. That is the undisputed significance of the term "miners' weight," and the weight is taken in the mine car before the contents go into the breaker. They must be presumed to have used the term deliberately and in that sense. It was manifestly inapt if what they had in mind was the yield either of "prepared sizes" or of "merchantable" coal of any size whatever. So, too, if they had intended to commit themselves unalterably to 2,464 pounds, then constituting the miners' ton, it would have been quite as easy, and much less awkward, to say so in so many words or figures. They were at pains to use a trade term which could rationally serve but one purpose,

namely, to make the royalty payable on the same tonnage for which the miners were being paid during the period of production. As between that and a fixed and invariable weight, it must be presumed they exercised their choice deliberately and for reasons satisfactory to themselves. But this view, say the counsel for plaintiffs, puts the contract of the parties to the hazard of alteration at the hands of strangers, viz: the operator and the miner. The obvious answer is, that the hazard, if any, looks both ways; each party incurred the like risk; instead of an increase, the vicissitudes of the business might have led to a decrease in the weight of the unit; and it was for the parties to say whether they chose to take that speculative chance.

As to plaintiffs' claim for pillar coal it is noted above in the eleventh conclusion of fact that the quantity has not been determined. The grant was entire. It passed all the coal with the right to mine and take it away. As against the express terms of such conveyance no former custom of mining can be successfully invoked: Coxe v. Heisley, 19 Pa. 242; Silliman v. Whitman, 11 Pa. Superior Ct. 243; Stoddard v. Emery, 128 Pa. 436; Harris v. Sharpless, 202 Pa. 243. Neither is the question affected by the restriction on methods of operation, inter alia, "that sufficient pillars of coal shall be left to support the roof over the gangways and the usual protection of the mines generally." This must be deemed a provision, not for the benefit of the surface, but for the preservation of the colliery with a view to winning the maximum quantity of coal, as in the analogous case of Miles v. Coal Co., 250 Pa. 147, the ruling in which is believed to be decisive against the plaintiffs in this particular; and for that reason it was deemed unnecessary to make any calculation of the quantity taken from pillars on second mining. Lessees are at liberty to take all the coal at the stipulated royalty; their liability for damages to the surface is another thing and is not contested. The fact having been found,

however, that there is no reason to apprehend further surface disturbance, there is no occasion to anticipate any injury calling for preventive relief, and the parties may be properly left to their action for damages if further injury should occur: Woods v. Coal Co., 230 Pa. 197.

Let a decree nisi be entered in accordance with the seventh and eighth general conclusions of law; exceptions, if any, sec. reg.

The final decree, from which both sides have appealed, is as follows:

### FINAL DECREE.

And now, 20th day of January, 1917, this cause came on to be heard on bill, answer, replication and proofs, and was fully argued by counsel. Exceptions having been filed to the findings and conclusions of the Chancellor, the same were argued before the court en banc, and thereupon, after full consideration thereof, it is ordered, adjudged and decreed, as follows, to wit:

First.—By the terms of the lease of 1863, the lessees defendants became accountable to the plaintiffs for royalties on coal mined and unpaid for, at royalty per miners' ton of three thousand and twenty-four (3,024) pounds of vein material, in the sum of $7,227.54, with interest from October 1, 1915.

Second.—By the terms of the lease of 1865, the same defendants owe the plaintiffs for royalties for coal mined from the Marcy vein, under said lease, and unpaid, the sum of $2,196.30, with interest from October 1, 1915. This is the amount due at ten cents per ton for coal shipped to market.

Third.—By the terms of the leases between the parties, the lessees defendants are indebted to the plaintiffs for damages to the surface, due to the subsidence thereof, in the sum of $125, with damage for the detention in the sum of $22.50, or $147.50.

Fourth.—An injunction to prevent the further mining of coal in pillars, is refused.

Fifth.—An injunction to restrain the mining, or decreeing forfeiture of the contracts, is denied.

Sixth.—It is ordered that lessees defendants pay to the plaintiffs the sums as decreed in paragraphs 1st, 2d and 3d, as follows:

| | |
|---|---|
| For coal mined and unpaid for in the veins below the Marcy vein, .................... | $7,227.54 |
| For coal mined and unpaid for in the Marcy vein, ................................. | 2,196.30 |
| For damage to the surface, ................. | 147.50 |
| Total, ............................... | $9,571.34 |

with interest from October 1, 1915.

Seventh.—All costs in the suit to be paid by the lessees defendants.

Exception to the final decree noted for plaintiffs and defendants.

Plaintiffs and defendants appealed.


*Errors assigned* were in dismissing exceptions to various findings of fact and law and the decree of the court.


*Samuel B. Price,* with him *John H. Price,* and *Cole B. Price,* for George Drake et al.—Defendants should account for each ton of 2,464 pounds of mined material: 1 Addison on Contracts, 421, Sec. 282; Jones et al. v. Giles et al., 10 Exch. 119; Hughes v. Humphreys, 3 Ell. & Bl. 954 (77 Eng. C. L. Rep. 954); 35 Cyc. 211; 30 A. & E. Enc. of Law, 463, and cases 2d Ed.; Forsyth v. No. American Oil Co., 53 Pa. 168; Philadelphia City Pass. Ry. Co. v. Henrice, 92 Pa. 431; McAleer v. McMurray, 58 Pa. 126; Hershinger v. Penna. R. R. Co., 25 Pa. Superior Ct. 147.

The contract should be construed according to the laws, usages and facts existing at the time of its execu-

tion: Reiser v. Wm. Tell Sav. Fund Assn., 39 Pa. 137; Merriam v. U. S., 107 U. S. 437; 27 Law Ed. 531; Berridge v. Glassey, 112 Pa. 442; Reading v. United Traction Co., 202 Pa. 571, 575.

The custom of miners is admissible to explain the meaning of the words of a mining lease: Brown v. Brooks, 25 Pa. 210; Williamson v. McClure, 37 Pa. 402; 1 Addison on Contracts 374; Carey v. Bright, 58 Pa. 70; Williams v. Summers et al., 45 Ind. 532; 1 Greenleaf on Ev., Sec. 282-282a, page 319, 12th Ed.; Brown on Parol Ev. 202; 17 A. & E. Enc. of Law, 18, 2d Ed.; Hillside Coal & Iron Co. v. Sterrick Creek Coal Co., 239 Pa. 359; Bickford v. Cooper & Co., 41 Pa. 142.

The damages awarded for breach of surface support are inadequate and the measure of damages so restricted that there is no remedy; an injunction should also issue: Berkey v. Berwind White Coal Mining Co., 220 Pa. 65; Streng v. Buck Run Coal Co., 241 Pa. 560; Woods v. Pittsburgh Coal Co., 230 Pa. 197; Jones v. Wagner et al., 66 Pa. 429; Coleman et al. v. Chadwick, 80 Pa. 81; Carlin & Co. v. Chappel, 101 Pa. 348; Williams v. Hay, 120 Pa. 485; Horner et al. v. Watson et al., 79 Pa. 242; Scranton et al. v. Phillips et al., 94 Pa. 15; Penn Gas Coal Co. v. Versailles Fuel Gas Co., 131 Pa. 522.

The court should have decreed a forfeiture of the leases: Munroe v. Armstrong, 96 Pa. 307; Brown v. Vandergrift, 80 Pa. 142; Andrews v. Landis, 24 Pa. D. R. 876; Chauvenet v. Person, 217 Pa. 464; Steelsmith v. Gartland, 44 L. R. A. 107.

*F. W. Wheaton* and *P. F. O'Neill,* with them *S. W. Rhoads* and *R. W. Rymer,* for John W. Berry, Trustee, et al.—At the date of the leases prepared coal included chestnut and all larger sizes, and merchantable coal consisted entirely of prepared coal: Wright v. Warrior Run Coal Co., 182 Pa. 514; Dunham v. Haggerty, 110 Pa. 560; Lance v. Lehigh & Wilkes-Barre Coal Co., 163 Pa. 84; New York & Pittston Coal Co. v. Hillside Coal

& Iron Co., 225 Pa. 211; Drake et al. v. Lacoe et al., 157 Pa. 17.

"Miners' weight" means such quantity of coal, slate and dirt as was agreed upon between the operators and the miners to be sufficient to make a ton of prepared coal: Drake et al. v. Lacoe et al., 157 Pa. 17.

OPINION BY MR. CHIEF JUSTICE BROWN, June 30, 1917:

The bill filed by Charles Drake, deceased, in which his executors are the substituted plaintiffs, is for an accounting by the defendants for coal mined under two leases. The prayers are also for a decree declaring the leases forfeited for conditions broken, for an injunction if they should not be declared forfeited, and for the ascertainment of damages alleged to have been sustained by reason of the caving in and falling of the surface of the demised lands, caused by the mining and removal by the defendants of the pillars of coal under the surface. The material facts, all of which were properly found by the learned chancellor below, appear in its opinion, made part of the reporter's notes. From the decree which followed them and the legal conclusions based upon them both sides have appealed.

By the first lease, dated November 28, 1863, Drake leased to the defendants' predecessors all the coal under seventy-eight acres of land in Lackawanna Township, then Luzerne (now Lackawanna) County, except the upper or Marcy vein, the lessees agreeing to pay an annual minimum rental of $500, for which they were permitted to remove five thousand tons of coal each year during the term of the lease, which was for ten years and for such other and further time as the lessees and their legal representatives should continue to pay the rent as named in the lease, unless the said term should sooner be ended by nonpayment of rent. For all coal mined in excess of five thousand tons a year the lessees were to pay ten cents per ton. The chief contention between the parties to this proceeding is as to the meaning or effect to

be given to the words in the lease "miners' weight to be the standard" of each ton of coal mined.

In Drake et al. v. Lacoe et al., 157 Pa. 17, we construed the words "miners' weight," used in the lease of November 28, 1863, to mean "such quantity of coal, slate and dirt, as was agreed upon between the operators and the miners to be sufficient to make a ton of prepared coal." In 1863 a "miners' weight" ton in the anthracite region, in which the Drake property is located, was a gross ton plus ten per cent., or 2,464 pounds, in the mine car. It was afterwards increased, and while it has varied somewhat in different sections of the valley in which the leased premises are located, it has been 3,024 pounds in their vicinity since about the year 1870; but, however it may have so varied, "miners' weight" ton has always been the weight of mine-run material which the miner must produce in order to be paid for mining a ton of coal, the excess being a more or less arbitrary allowance against him for refuse and waste in the mine car content. During the period for which an accounting is asked a "miners' weight" ton has been 3,024 pounds, and upon that basis the defendants are directed by the court below to account under the first lease. The main complaint of the plaintiffs is that the accounting ought to be made on the basis of 2,464 pounds—a "miners' weight" ton at the time of the execution of the lease of 1863. If the intention of the parties to that lease was that the then "miners' weight" ton should be the unvarying standard during the whole term of the lease upon which the royalties were to be paid, they readily could, and most naturally would, have fixed it in figures at 2,464 pounds, for they are presumed to have known that a "miners' weight" ton —the amount of mine-run material which a miner must produce in order to be paid for mining a ton of coal— would vary from time to time with changes in the quality of the material obtained from the mine. "Miners' weight," as we define it in Drake et al. v. Lacoe et al., is not a fixed, unvarying quantity of mine-run material,

but is such quantity of the same as operators and miners may from time to time agree as being necessary or sufficient to produce a ton of prepared coal.  This varying standard was manifestly adopted by the lessor and lessees when they used the well-known trade term "miners' weight"—the ton weight of material required to be mined as equivalent to a ton of prepared coal— and the learned court below properly held that the accounting must be on the basis of a "miners' weight" ton as fixed and agreed upon by the operators and miners during the accounting period.

Nothing said in Drake et al. v. Lacoe et al. sustains the contention of the defendants that their liability is limited to prepared sizes of coal.  The decree in that case related to the lease of 1865 of the upper vein, and what we said was that, as the plaintiffs and defendants had placed their own interpretation upon its terms, they were both bound by it.

We need add nothing to what was said by the court below as to the plaintiffs' claim for pillar coal, and we concur in its conclusion that, under the evidence, they were not entitled to an injunction to restrain further mining, nor to a decree declaring the leases forfeited.

Each appeal is dismissed at the costs of the appellants.